[L. A. No. 16986. In Bank.—June 8, 1939.]

JERSEY MAID MILK PRODUCTS CO., INC. (a Corporation), et al., Respondents, v. A. A. BROCK, Director of Agriculture, etc., Appellant.

U. S. Webb, Attorney-General, Earl Warren, Attorney-General, and Walter L. Bowers, Deputy Attorney-General, for Appellant.

John L. Flynn for Respondents.

Mark M. Cohen and Irwin M. Fulop, as *Amici Curiae,* on Behalf of Respondents.

CURTIS, J.—In this action certain producers and distributors of fluid milk and fluid cream both at wholesale and retail joined with certain consumers of the same product, all in the county of Los Angeles, as parties plaintiff, and brought this action against the defendant, A. A. Brock, as Director of Agriculture of the State of California, to prevent the enforcement and administration of the so-called Milk Stabilization Act, being chapter 10, division IV, of the Agricultural Code, upon the ground that said act violates both the federal and state Constitutions. A temporary restraining order was granted *ex parte* and an order to show

cause why a preliminary injunction should not be granted was immediately issued. Defendant appeared and filed a general demurrer which, after a hearing thereon, was overruled with permission to answer within ten days, and a preliminary injunction was granted. The defendant, resting upon his demurrer, declined to answer, and his default was regularly taken, and a formal judgment was entered permanently restraining and enjoining said defendant as director of agriculture ''from in any manner whatsoever enforcing or attempting to enforce, as against the plaintiffs, or any of them, any of the terms or provisions of chapter 10, division IV, of the Agricultural Code of the State of California''. From this judgment, the defendant has appealed.

As the judgment was rendered after the overruling of a demurrer to the complaint, we shall give a brief synopsis of the complaint. Paragraphs I to VIII, inclusive, set up the character and capacities of the plaintiffs and of the defendant. Paragraph IX gives a brief history of the act in question, to which we shall refer in more detail later in this opinion. Paragraph X was stricken out by the court and there is no paragraph XI. Paragraph XII alleges the designation by defendant, pursuant to the terms of said act, of a Los Angeles County marketing area, and the formulation of a stabilization and marketing plan for such area, under the provisions of said act. Paragraph XIII asserts the enforcement and threatened continuous enforcement of said act and the plan thus formulated thereunder. Paragraphs XIV and XV set forth the asserted damages suffered by reason of the enforced compliance with said act. Paragraphs XVI to XIX, inclusive, set forth the proceedings in another action, similar in character to the present action but by different plaintiffs, then pending in the Superior Court of the County of Los Angeles. Paragraph XX alleges that defendant refuses to terminate such plan and intends to continue to enforce the same. Paragraph XXI specified certain particulars in which it is alleged the act is unconstitutional and paragraph XXII is the usual allegation of the inadequacy of any remedy at law.

It is apparent, therefore, that the only question presented by the pleadings is one of law, that is, whether chapter 10, division IV, of the Agricultural Code of this state is constitutional. If it is constitutional, then the complaint fails · to state a cause of action, and the demurrer should have been

sustained. If the act is unconstitutional, then the demurrer was properly overruled, and the judgment based upon the order overruling the demurrer should be affirmed.

The Agricultural Code was enacted in 1933. (Stats. 1933, p. 60.) In 1935, chapter 10, division IV, was added to the code (Stats. 1935, p. 922), and in 1937, various amendments were made to said chapter 10, and a new article, entitled article 2a, was added to said chapter. (Stats. 1937, pp. 42, 1372.) Article 2a purports to empower the director of agriculture, by following certain provisions of said act, to prescribe and enforce minimum wholesale and retail prices for fluid cream and fluid milk. Division IV of the Agricultural Code is devoted exclusively to the subject of dairies and dairy products, and chapter 10 of said division IV of said code relates to the stabilization and marketing of fluid milk and fluid cream. Chapter 10 includes sections 735 to 738, both inclusive, of the Agricultural Code, and all intervening fractionally numbered sections, such as 735.1, 735.2, etc. All references to sections of said code and other provisions of said chapter 10 will be made thereto as the same were in effect after the amendment by the legislature in 1937.

Sections 735 and 735.1 are as follows:

"735. Legislative declaration. (a) The production and distribution of fluid milk and of fluid cream and the dissemination of accurate, scientific information as to the importance of milk and other dairy products in the maintenance of a high level of public health, is hereby declared to be a business affected with a public interest. The provisions of this chapter are enacted in the exercise of police powers of this State for the purpose of protecting the health and welfare of the people of this State.

"(b) It is hereby declared that fluid milk and fluid cream are necessary articles of food for human consumption; that the production and maintenance of an adequate supply of healthful milk of proper chemical and physical content, free from contamination, is vital to the public health and welfare, and that the production, transportation, processing, storage, distribution or sale of fluid milk and fluid cream in the State of California is an industry affecting the public health and welfare; that unfair, unjust, destructive and demoralizing trade practices have been carried on and are now being carried on in the production, marketing, sale, processing or distribution of fluid milk and fluid cream, which constitute

a constant menace to the health and welfare of the inhabitants of this State and tend to undermine sanitary regulations and standards of content and purity, however effectually such sanitary regulations may be enforced; that health regulations alone are insufficient to prevent disturbances in the milk industry which threaten to destroy and seriously impair the future supply of fluid milk; and to safeguard the consuming public from future inadequacy of a supply of this necessary commodity; that it is the policy of this State to promote, foster and encourage the intelligent production and orderly marketing of commodities necessary to its citizens, including milk, and to eliminate speculation, waste, improper marketing, unfair and destructive trade practices, and improper accounting for milk purchased from producers.

''(c) It is recognized by the Legislature that conditions within the milk industry of this State are such that it is necessary to establish marketing areas wherein different prices and regulations are necessary, and for that purpose the Director of Agriculture of this State shall have the administrative authority, with such additional duties as are herein prescribed, after investigation and public hearing, to prescribe such marketing areas and modify the same when advisable or necessary.

''(d) The foregoing statements of facts, policy and application of this law are hereby declared a matter of legislative determination.''

''735.1. Purposes of chapter: Legislative intent. The purposes of this chapter are to:

''(a) Provide funds for administration and enforcement of this act, by assessments to be paid by producers of fluid milk or fluid cream, or both, and from licenses issued to distributors in the manner prescribed herein.

''(b) To authorize and enable the director to prescribe marketing areas and to determine prices to producers for fluid milk or fluid cream, or both, which are necessary due to varying factors of costs of production, health regulations, transportation and other factors in said marketing areas of this State, provided that the cost to distributors within any marketing area, for fluid milk or fluid cream shall be uniform with all other distributors purchasing fluid milk and fluid cream of similar grade or quality under like terms and conditions.

"(c) To authorize and enable the director to formulate stabilization and marketing plans subject to the limitations herein prescribed with respect to the contents of such stabilization and marketing plans and declare such plans in effect for any marketing area.

"(d) Enable the dairy industry with the aid of the State to correct existing evils, develop and maintain satisfactory marketing conditions, and bring about a reasonable amount of stability and prosperity in the production and marketing of fluid milk and fluid cream and provide means for carrying on essential educational activities.

"It is the intent of the Legislature that the powers herein conferred shall be liberally construed. Nothing in this chapter shall be construed as permitting or authorizing the development of conditions of monopoly in the production or distribution of fluid milk or fluid cream. In the establishment of the terms and conditions under which fluid milk and fluid cream shall be purchased from producers, and under which distributors and retail stores shall sell and distribute the same, such terms and conditions shall be those which will, in the several localities and markets of the State and under the varying conditions of production and distribution insure an adequate and continuous supply of pure fresh wholesome fluid milk and fluid cream to consumers thereof at fair and reasonable prices."

Section 735.2 gives to the director of agriculture authority to enforce the provisions of said chapter and any stabilization and marketing plan initiated under the provisions thereof and for that purpose to make such rules and regulations as he may deem necessary.

Section 735.3 defines certain terms used in said act, and is as follows:

"735.3. Definitions. As used in this chapter:

"(a) 'Board' means any local control board created as herein authorized.

"(b) 'Fluid milk' means any and all milk produced in conformity with the quality standards prescribed by the Agricultural Code for 'market milk' and for the purposes of this chapter may be classified as follows: Class 1. Any such milk which is supplied to the consumer in the natural fluid state or prepared for human consumption without being converted into any other form or product, and including milk fat used in the standardization of such milk; Class 2.

Any such milk or cream derived from such milk sold or used for consumption as cream; Class 3. Any such milk or the cream derived from such milk used in the manufacture of ice cream, ice milk, flavored milk drinks, buttermilk and cottage cheese; Class 4. Any such milk or the cream derived from such milk used in the manufacture of butter.

"(c) 'Fluid cream' means any and all cream obtained from 'fluid milk', and may include whole milk which had been purchased or acquired for the derivation of cream for consumption as cream, or which cream is to be used in the manufacture of ice cream, ice milk, flavored milk drinks, buttermilk and cottage cheese.

"(d) 'Dairy products' includes any product manufactured from milk or any derivative or product of milk.

"(e) 'Producer' means any person who produces fluid milk or fluid cream in conformity with the applicable health regulations of the place in which it is sold.

"(f) 'Distributor' means any person whether or not such person is a producer or an association of producers, engaged in the business of distributing or handling fluid milk or fluid cream for sale, including persons (a) who pasteurize, bottle or process fluid milk or fluid cream; (b) who distribute fluid milk or fluid cream at wholesale, retail or otherwise (1) to hotels, restaurants, stores or other establishments for consumption on the premises, (2) to stores or other establishments for resale, or (3) to consumers.

"(g) 'Retail store' means any person or persons owning or operating a retail grocery store, restaurant, confectionary, or other similar business where fluid milk or fluid cream is sold to the general public for consumption off the premises.

"(h) 'Marketing area' is any area within this State declared to be such in the manner prescribed in this chapter.

"(i) 'Stabilization and marketing plan' means any plan formulated and made effective by the director within the legislative standards provided by this chapter and shall include, among other things the establishing of prices to be paid by distributors for any or all of the various classes of fluid milk or fluid cream.

"(j) 'Consumer' means any person who purchases fluid milk, fluid cream or dairy products for consumption.

"(k) 'Person' means any individual, firm, corporation, association or any other business unit."

Passing over certain sections of the chapter for the time being, we find that by section 736 it is provided that: "As soon as possible after the effective date of this chapter the director shall designate marketing areas which he deems necessary or advisable to effectuate the purposes of this chapter, and wherein he finds the conditions affecting the production, distribution and sale of fluid milk, fluid cream or both are reasonably uniform. The director shall have the power to establish additional areas or to modify areas theretofore established when he deems the establishment or modification of such areas necessary or advisable to effectuate the purposes of this chapter."

Respecting the formulation of a stabilization and marketing plan for any area after it has been designated by the director, it is provided in section 735.4 of said chapter that the director shall have the power "to formulate any stabilization and marketing plan as prescribed in this chapter and declare the same effective after public hearing and reasonable notice by mail or otherwise to all producers and distributors of record with the director, affected by such plan".

The proceedings leading up to the formulation of a stabilization and marketing plan for any area are provided for in section 736.1 of said code as follows: "The director shall, prior to the formulation of a stabilization and marketing plan for any area, conduct a hearing in said area for the purpose of determining whether or not the producers who produce sixty-five per cent of the fluid milk for said area and whose major interest is in the production of fluid milk for said area or of the producers who produce sixty-five per cent of the fluid cream for said area and whose major interest is in the production of fluid cream for the area desire that a stabilization and marketing plan as to fluid milk or fluid cream be formulated for such area; but if a petition for a plan is presented by the producers who produce sixty-five per cent of the fluid milk for said area and whose major interest is in the production of fluid milk for said area or by the producers who produce sixty-five per cent of the fluid cream for said area and whose major interest is in the production of fluid cream for the area, it shall not be necessary that such hearing be held. If the director finds that a stabilization and marketing plan is necessary to accomplish the purposes of this chapter, he shall formulate a stabilization and marketing plan for fluid milk or fluid cream or both for such area and

issue a notice of public hearing upon the plan formulated to all producers and distributors of record with the Department of Agriculture who may be subjected to the provisions of such plan. The notice of hearing may be effected by mail, or by publication for five successive days in a newspaper of general circulation in the area designated and shall specify the time and place of such hearing, which shall not be held prior to ten days from the mailing, or from the final publication of such notice, provided, however, that if no daily newspaper of general circulation is published in the area designated, publication of notice for two successive weeks in a weekly newspaper of general circulation in the area will be considered proper publication of notice. At the hearing, interested parties shall be heard and records kept of the proceedings of such hearing for determination by the director whether the plan proposed will accomplish the purposes of this chapter. If, after public hearing the director determines that the proposed plan will tend to accomplish the purposes of this chapter within the standards herein prescribed, he shall issue an order to all producers and distributors of record with the director, and subject to the provisions of such plan, declaring such plan in effect within 30 days from the date of such hearing.''

By section 736.3, it is provided that any stabilization and marketing plan shall contain the following provisions:

''(a) Unfair practices. Provisions for prohibiting distributors from engaging in the unfair practices hereinafter set forth:

''(1) The payment, allowance or acceptance of secret rebates, secret refunds, or unearned discounts by any person, whether in the form of money or otherwise.

''(2) The giving of any milk, cream, dairy products, services or articles of any kind, except to *bona fide* charities, for the purpose of securing the fluid milk or fluid cream business of any customer.

''(3) The extension to certain customers of special prices or services not made available to all customers who purchase fluid milk or fluid cream of like quantity under like terms and conditions.

''(4) The false or misleading advertising of fluid milk or fluid cream as defined in section 654a of the Penal Code.

''(5) The purchase of any fluid milk in excess of one hundred gallons monthly from any producer or association of

producers unless a written contract has been entered into with such producer or association of producers stating the amount of fluid milk to be purchased for any period; the quantity of such milk to be paid for as Class 1, and Class 2, and the price to be paid for each of the several classes, but in any marketing plan where an equalization pool is in operation such contract need not specify the quantity of the several classes. The contract shall also state the date and method of payment, the charges for transportation if hauled by the distributor, and may contain such other provisions as are not in conflict with this chapter. A signed copy of such contract shall be filed by the distributor with the director within five days from the date of its execution.

"(b) Minimum prices. Provisions whereby the director designates and prescribes or provides methods for designating or prescribing minimum prices to be paid by distributors to producers, for fluid milk in one or more of the various classes; provided, however, that the prices so designated or prescribed shall be based upon the economic relationship of the price of fluid milk for the marketing area involved to the price of manufacturing milk, taking into consideration the additional costs incurred in producing and marketing fluid milk over and above costs incurred in producing and marketing manufacturing milk; and provided further, the director finds that such prices will tend to effectuate the purposes and policy of this chapter and will insure consumers a sufficient quantity of pure and wholesome milk."

Article 2a of said chapter which, as we have seen, was added thereto by the legislature in 1937, vests authority in the director to prescribe and enforce minimum wholesale prices and minimum retail prices for the marketing of fluid milk and fluid cream, and the first three sections of this article are as follows:

"Section 736.10 Authority of director. Pursuant to the declaration and statements of facts, policy and purposes set forth in this chapter, the director is hereby vested with the additional administrative duty and authority to prescribe and enforce minimum wholesale prices and minimum prices as hereinafter set forth."

"Section 736.11 Designation of prices in marketing areas. The director shall, as soon as possible after the effective date hereof, in all marketing areas wherein a stabilization and

marketing plan is in effect under the provisions of this chapter, designate and prescribe or provide methods for designating and prescribing,

"(a) Minimum wholesale prices which, as used herein, shall mean prices at which fluid milk or fluid cream, or both, shall be sold by distributors to retail stores including the prices at which fluid milk or fluid cream shall be sold by distributors to retail stores, restaurants, confectioneries and other places for consumption on the premises but excluding, however, the prices at which fluid milk or fluid cream, or both, shall be sold by distributors to retail stores owned or operated by such distributor; and

"(b) Minimum retail prices which, as used herein, shall mean prices at which fluid milk or fluid cream, or both, shall be sold by distributors and retail stores to consumers.

"At the time any stabilization and marketing plan is hereafter established under the provisions of this chapter, the director shall designate and prescribe, or provide methods for designating and prescribing, such minimum wholesale prices and such minimum retail prices; provided, however, that all prices established under the terms of this article shall be such prices as are determined by the director pursuant to the provisions of section 736.12."

"Section 736.12. Determination of prices; Investigation: Hearings: Notice and Record: Factors to be considered: Establishment and declaration of prices: Restrictions. In determining minimum wholesale prices and minimum retail prices in any marketing area, the director shall first make an investigation in such marketing area to establish such facts as shall be necessary to permit him to carry out the intent of this article within the standards herein prescribed. In making such investigation, the director may examine the books and records of distributors and retail stores in such marketing area and shall hold one or more public hearings, take testimony and may subpoena witnesses. All testimony received at such hearings shall be under oath. Notice of any hearing held by the director, pursuant to this article, shall be given by the director to every distributor and retail store in such marketing area whose name appears upon the records of the Department of Agriculture or files a request for the same with the department, by mail or by publication for the time and in the manner prescribed in section 736.1 of this

chapter. A record of any and all hearings held by the director, pursuant to this article, shall be made and filed in the office of the director and shall, at all times, be available to inspection by any interested person.

"Factors to be considered. In determining minimum wholesale and minimum retail prices for any marketing area, the director shall take into consideration the following economic factors operative in such marketing area:

" (1) The quantities of fluid milk or fluid cream, or both, distributed in such marketing area.

" (2) The quantities of fluid milk or fluid cream, or both, normally required by consumers in such marketing area.

" (3) The cost of fluid milk or fluid cream, or both, in such marketing area to distributors and retail stores, which in all cases shall be, respectively, the prices paid by distributors to producers and the minimum wholesale prices, as established pursuant to this chapter.

" (4) The reasonable cost of handling fluid milk or fluid cream, or both, incurred by distributors and retail stores, including all costs of hauling, processing, selling and delivering by the several methods used in such marketing area in accomplishing such hauling, processing, selling and delivery, as such costs are determined by impartial surveys or audits, or both, of the books and records of all, or such portion of the distributors and retail stores of each type or class in such marketing area as are found by the director to be representative to indicate the costs of all distributors and retail stores in such marketing area.

" (5) The amount of the available capacity for processing and distributing fluid milk, or fluid cream, or both, of all distributors and retail stores in such marketing area and the estimated extent to which such available capacity is being used by such distributors and retail stores.

" (6) The purchasing power of consumers in such marketing area.

"Establishment and declaration of prices: Restrictions. Following such hearings, investigations and examinations authorized above, the director shall establish minimum wholesale and minimum retail prices for such marketing area, and shall declare such prices effective in the same manner as that prescribed in this chapter for declaring producer prices effective,

provided that the director finds, in writing, with respect to such prices.

"(1) That such prices are sufficient, but not more than sufficient, to cover all necessary costs, according to the method or type of distribution, including a reasonable return upon necessary capital invested, of reasonably efficient distributors and retail stores engaged in the distribution of fluid milk, fluid cream, or both, in such marketing area as such necessary costs of reasonably efficient distributors and retail stores are shown to the director by the facts available to the director from the investigations, surveys, audits, and hearings required in this section.

"(2) That such prices will tend to maintain in the business of distributing fluid milk and fluid cream, or both, such number of reasonably efficient retail stores and distributors of fluid milk and fluid cream, or both, in such marketing area as the director finds is necessary to insure to consumers in such marketing area sufficient distribution facilities of the several types or methods commonly used by consumers.

"(3) That such prices will protect the interests of consumers of fluid milk, fluid cream, or both, in such marketing area by insuring to them adequate and efficient distribution facilities of the several types or methods commonly used by them without requiring such consumers to pay more for their supplies of such fluid milk, fluid cream, or both, than is necessary to maintain such adequate and efficient distribution facilities in such marketing area."

The other sections of this article prohibit sales at less than the established prices and provide for the payment of a fee by each distributor, and for the appointment of a local control board in each area to assist and advise the director in matters pertaining to the marketing, distribution and sale of fluid milk or fluid cream, or both, in said areas. There are still a number of other sections in said chapter which may be later discussed in case any question is raised respecting their meaning, validity, or applicability.

Originally this case as it came before us was briefed by the attorney-general on behalf of the director of agriculture, as appellant, and the attorney for the respondents. Just prior to the argument of the case, leave was given to *amici curiae* to file a brief in support of the position taken by the respondents. To this brief, the attorney-general has filed a

reply. In our discussion of this case, we shall endeavor to cover all points raised by either the respondents or by the *amici curiae* without reference to any order in which these points are set forth in the respective briefs.

As noted above, the sole question presented on this appeal is the constitutionality of chapter 10 of division IV of the Agricultural Code of this state. No exception is taken to any procedural steps pursued by the director of agriculture in the designation of the area consisting of the county of Los Angeles, as the "Los Angeles County Marketing Area", or in the formation of a stabilization and marketing plan for said area; nor is any contention made that said director has not proceeded in strict compliance with the terms of said chapter 10 in each and every act on his part to be performed leading up to and including the determination and fixing of the minimum wholesale and retail price to be charged for fluid milk and cream within said Los Angeles County area.

It hardly seems necessary in discussing the constitutionality of said measure to call attention to the well-established and universally recognized principal of law that all presumptions and intendments are in favor of the constitutionality of a statute enacted by the legislature; all doubts are to be resolved in favor and not against the validity of a statute; that before an act of a coordinate branch of the government can be declared invalid by the judiciary for the reason that it is in conflict with the Constitution, such conflict must be clear, positive, and unquestionable; and in case of a fair and reasonable doubt as to its constitutionality, the statute should be upheld and the doubt resolved in favor of the expressed wishes of the people as given in the statute. (5 Cal. Jur., p. 628; *Legal Tender Cases*, 12 Wall. 457, 531 [20 L. Ed. 287]; *Sinking-Fund Cases, Union P. R. Co.* v. *United States*, 99 U. S. 700, 718 [25 L. Ed. 496]; *Trade-Mark Cases, United States* v. *Steffens*, 100 U. S. 82, 96 [25 L. Ed. 550]; *In re Spencer*, 149 Cal. 396, 400 [86 Pac. 896, 117 Am. St. Rep. 137, 9 Ann. Cas. 1105]; *People* v. *Globe Grain & Mill. Co.*, 211 Cal. 121, 127 [294 Pac. 3].)

The first contention made against the validity of chapter 10 by the respondents, in which the *amici curiae* join, is that it is unconstitutional as an improper exercise of the police power of the state in violation of the due process clause of the federal Constitution. In this connection, it is argued

that the milk industry is not clothed with a public interest and, therefore, the legislature is powerless to regulate it under the police power of the state. The question as to whether the milk business bears such a relation to the welfare of those dependent upon its use as to be clothed with a public interest has been, in our opinion, set at rest by the decision of the United States Supreme Court in the case of *Nebbia* v. *New York,* 291 U. S. 502 [54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469]. That case has been so recently and frequently reviewed by this court (*Max Factor & Co.* v. *Kunsman,* 5 Cal. (2d) 446, 456 [55 Pac. (2d) 177], *Agricultural Prorate Com.* v. *Superior Court,* 5 Cal. (2d) 550, 576 [55 Pac. (2d) 495], and *Wholesale Tobacco Dealers Bureau, etc.,* v. *National Candy & Tobacco Co.,* 11 Cal. (2d) 634, 647 [82 Pac. (2d) 3, 118 A. L. R. 486]), that any extended reference to it at this time seems unnecessary. That case is particularly applicable to the instant action as the court not only held that the milk business was ''clothed with a public interest'' and was therefore subject to regulation by the legislature, but it also held that the power to regulate extended to and included the power to fix the price at which milk might be sold. In the course of its opinion, the court said (p. 532) : ''The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago.'' Further on in its opinion, the court states (p. 537) : ''But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells.'' We have followed the Nebbia case in our previous decisions, and the principles of law therein announced must be held to be firmly and finally established in this state. The decisions relied upon by both respondents and *amici curiae* were rendered prior to the decision in the Nebbia case, and cannot at this time be considered as authoritative declarations of the law announced in that decision. ■ *Amici curiae* seek to distinguish the

Nebbia case from the instant case, and particularly call our attention to the fact that the New York statute was of a temporary duration while the California act is without any limitation as to duration, but they fail to show how this difference in the two statutes does in any way divest the legislature of the power to protect an industry from a perilous condition which is permanent in character. Furthermore, the rule appears to be well established that, "Failure by the legislature to limit the operation of the law to a definite term does not render the law invalid so long as the conditions which justify the passage of the law remain." (*People by Van Schaick v. Title & Mortgage Guarantee Co.*, 264 N. Y. 69 [190 N. E. 153, 96 A. L. R. 297].)

In addition to the Nebbia case, the following authorities hold that it is within the police power of the state to regulate the milk industry by fixing the prices which may be charged therefor: *Highland Farms Dairy v. Agnew*, 300 U. S. 608 [57 Sup. Ct. 549, 81 L. Ed. 835]; *Franklin v. State*, 232 Ala. 637 [169 So. 295]; *Miami Home Milk Producers Assn. v. Milk Control Board*, 124 Fla. 797 [169 So. 541]; *Bohannon v. Duncan*, 185 Ga. 840 [196 S. E. 897]; *Albert v. Milk Control Board*, 210 Ind. 283 [200 N. E. 688]; *State Board of Milk Control v. Newark Milk Co.*, 118 N. J. Eq. 504 [179 Atl. 116]; *Rohrer v. Milk Control Board*, 322 Pa. 257 [186 Atl. 336]; *Reynolds v. Milk Commission*, 163 Va. 957 [179 S. E. 507]; *State v. Lincoln Dairy Co.*, 221 Wis. 1 [265 N. W. 197, 851].

The Nebbia case is not only decisive of the questions just discussed but settles many of the general principles applicable to and governing the power of the legislature to enact regulatory legislation like that embodied in chapter 10 of division IV of the Agricultural Code. Having, therefore, held that under the police power of the state the legislature may regulate the marketing of fluid milk, and may even fix the price at which it may be sold, the only other question that can possibly arise in passing upon said chapter 10 as a whole must necessarily relate either to the alleged discriminatory provisions of the code, or to the procedural steps required to be taken by the director of agriculture to put into effect and to enforce said regulations.

Under the claim that the act is discriminatory, it is contended that chapter 10 is unconstitutional because all

persons engaged in the milk business are not subject to its terms. Chapter 10 purports to regulate the producer, the distributor, and the consumer, in connection with fluid milk and fluid cream, but does not apply to the producer, the distributor, or the consumer of any other class or kind of milk or cream.

■ "Fluid milk" as defined by the Agricultural Code means "any and all milk produced in conformity with the quality standards prescribed by the Agricultural Code for 'market milk' and includes both fluid milk and fluid cream. (Sec. 735.3.) " 'Market milk' is milk which is supplied to the consumer in the natural fluid state, or prepared for human consumption without being converted into any other form or product, as distinguished from manufacturing milk." (Sec. 479 of the Agricultural Code.) This section of the code also prescribes the quality standards in conformity with which "market milk" must be produced. Among these standards is one requiring that all "market milk" shall be produced from nonreacting tuberculin tested cows or goats, and others require that all "market milk" sold to the retail trade shall be contained in standard milk bottles which have been mechanically filled and capped, in a properly designed, equipped and approved milk room, and that all receptacles used to contain "market milk" shall be washed, sterilized, etc. By these provisions of the Agricultural Code, "fluid milk" means the same as "market milk" and includes fluid cream as well as fluid milk. ■ It is apparent, therefore, that the legislature has divided the milk industry into two classes, one class including all those engaged in producing, distributing, and consuming market or fluid milk and those dealing in manufacturing milk. It may be stated here that the Agricultural Code does not define "manufacturing milk" but from the language of section 479 of the Agricultural Code, we understand that it comprises and includes all milk supplied or prepared for human consumption, except market or fluid milk.

■ In support of respondents' contention that the act is unconstitutional because it discriminates between these two classes of persons, respondents cite section 11, article I, section 21 of article I of the Constitution. Section 11 of article I provides that: "All laws of a general nature shall have a uniform operation." A statute is uniform in its operation if it applies alike to all persons or objects within a class founded upon some natural, intrinsic, or constitutional distinction.

(*Vail* v. *San Diego County,* 126 Cal. 35 [58 Pac. 392], *Heron* v. *Riley,* 209 Cal. 507 [289 Pac. 160], and *People* v. *Dawson,* 210 Cal. 366 [292 Pac. 267].) In the last cited case, this court has stated this well established rule as follows: ''A general rule, and one which has been so universally followed as to require no citation of authority therefor, is that where a statute is made to appy equally as to all persons embraced within a natural class, the constitutional provisions directed against special legislation, lack of uniformity in the operation of the law, and the like, are not violated.''

It might be well to note here that section 479 of the Agricultural Code was enacted in 1933 and was in force some two years prior to the enactment of chapter 10 of division IV of the code, and four years prior to the enactment of article 2a of said chapter. As we have seen, this section of the code divides milk into two separate and distinct classes, market or fluid milk, and manufacturing milk. Fluid milk embraces all forms of fresh milk and cream either in its natural state or prepared for human consumption. It must meet the requirements of certain fixed standards of quality, a few of which are enumerated above. Fluid milk must be produced fairly close to the locality where it is consumed. The time intervening between its production and consumption must, necessarily from its very nature, be of extremely short duration. Unless it meets these standards of quality, or others equally necessary, in many cases it would be unfit for human consumption. The same injurious result would follow if its delivery from the producer through the distributor to the consumer was not made promptly and at regular intervals. These standards of quality and marketing requirements which are made applicable, or which apply to the marketing of fluid milk, are neither required, nor from its nature should be required, of manufacturing milk. The division of the milk industry into the two classifications, one governing the marketing of fluid milk, and the other applying to manufacturing milk, is therefore, founded upon a natural distinction existing between the two branches of the same industry. Chapter 10 of division IV is made applicable to all persons engaged in the business of marketing fluid milk, and as it is uniform in its operation upon all members of that class, it is not at variance with section 11 of article I of the Constitution which requires that all laws of a general nature shall have uniform operation.

Section 21 of article I of the Constitution provides: " . . . nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens". As we have seen the provisions of the Agricultural Code relative to the stabilization and marketing of fluid milk applies to all persons engaged in the marketing, distributing and consumption of milk of that class, and it has been held that where a statute applies to all persons or things within a definite class, and the classification of such persons or things is based upon some constitutional or natural or intrinsic distinction, the statute is not violative of this section of the Constitution. (*Martin* v. *Superior Court*, 194 Cal. 93, 100 [227 Pac. 762].) We, therefore, conclude that the act in question is not violative of either of the two sections of the Constitution quoted above.

It is contended further that the act (chapter 10) imposes an unequal burden on the consumers. No substantial argument is advanced in support of this contention, and for that reason we assume that this contention has been abandoned by respondents.

We shall now pass to the consideration of those objections to said chapter 10 which are based upon a contention that certain provisions of the act prescribing the procedural steps to be taken by the director of agriculture, in order to put into effect and to enforce a stabilization and marketing plan, are in contravention to certain constitutional limitations, and are therefore illegal and void.

*Amici curiae* join with respondents in contending that chapter 10 of division IV is unconstitutional and void because in a number of instances it attempts to delegate legislative powers of the director of agriculture. The first section assailed on that ground is section 736.

By section 736 it is made the duty of the director of agriculture to designate marketing areas which he deems necessary or advisable to effectuate the purpose of said chapter 10. The invalidity of this section of the act, it is contended, is due to the fact that there is no designation of any standard of measurement in the act by which the director may be guided in designating marketing areas. In other words, it is claimed that this section of the act leaves the designating of the marketing area solely and entirely in the uncontrolled discretion of the director of agriculture. If

642

such is the effect of this section without any limitation or direction in the exercise of the power so given, then it is void as an attempt to delegate legislative power to an administrative officer. (*Dominguez Land Corp.* v. *Daugherty*, 196 Cal. 468 [238 Pac. 703]; *Schaezlein* v. *Cabaniss*, 135 Cal. 466 [67 Pac. 755, 87 Am. St. Rep. 122, 56 L. R. A. 733]; *Hewitt* v. *State Board of Medical Examiners*, 148 Cal. 590 [84 Pac. 39, 113 Am. St. Rep. 315, 7 Ann. Cas. 750, 3 L. R. A. (N. S.) 896].) However, this section of the act further provides that the director of agriculture may establish market areas only in those localities "wherein he finds the conditions affecting the production, distribution, and sale of fluid milk, fluid cream, or both, are reasonably uniform". It is the position of the appellant that this section of the code, including that portion just quoted, lays down a sufficient standard for the guidance of the director in designating various marketing areas in the state. By this section, the director is not given the unlimited power to designate areas which he deems necessary or advisable to effectuate the purposes of chapter 10, but his power is limited to designating areas only in those localities wherein the conditions affecting the production, distribution, and sale of fluid milk and cream are reasonably uniform. Uniformity of conditions under which milk and cream are produced and sold would seem to be a sufficient standard to guide the director in designating marketing areas for the sale of these products.

In the case of *Dominguez Land Corp.* v. *Daugherty*, 196 Cal. 468, 484 [238 Pac. 703], we find the following statement of the law relative to the power of the legislature to delegate authority to an administrative officer. "A more difficult problem is involved in the question whether there is an improper delegation of legislative power. It is well settled that the legislature may commit to an administrative officer the power to determine whether the facts of a particular case bring it within a rule or standard previously established by the legislature for his governance. A familiar illustration is where the legislature enacts a law prescribing that the rates to be charged by a public utility shall be 'reasonable', and creates a commission with power to investigate and fix the rates."

In the instant case the legislature has conferred upon the director of agriculture the power to designate marketing areas wherein he finds the conditions affecting the fluid milk

industry reasonably uniform. The legislature has thus established uniformity of marketing conditions as the standard for the establishment of a marketing area and has committed to the director the power to determine the areas wherein such uniformity exists. Uniformity of marketing conditions in the fluid milk industry is, in our opinion, a sufficient standard for the guidance of the director in designating marketing areas, and is supported by the decision of this court in the Dominguez Land Corporation case, and also by the following authorities: *Federal Radio Commission* v. *Nelson Bros., etc.,* 289 U. S. 266, 279, 285 [53 Sup. Ct. 627, 77 L. Ed. 1166, 89 A. L. R. 406]; *People* v. *Associated Oil Co.,* 211 Cal. 93, 107 [294 Pac. 717]; *Agricultural Prorate Com.* v. *Superior Court,* 5 Cal. (2d) 550, 569 [55 Pac. (2d) 495]; *Brock* v. *Superior Court,* 9 Cal. (2d) 291, and cases cited therein on page 296 [71 Pac. (2d) 209, 114 A. L. R. 127]; also *Whittier etc. Assn.* v. *Agricultural Prorate Com.,* 11 Cal. (2d) 470, 473 [80 Pac. (2d) 983].

The authorities relied upon in behalf of the respondents may be easily distinguished from those just cited. The strongest of these cases in favor of respondents is that of *Van Winkle* v. *Fred Meyer, Inc.,* 151 Or. 455 [49 Pac. (2d) 1140]. We showed the inapplicability of that case to a situation like that existing in the present case in our opinion in the *Agricultural Prorate Case,* 5 Cal. (2d) 550, 571 [55 Pac. (2d) 495], and refused to follow it in the Brock case. (9 Cal. (2d) 291.)

As section 736 of the Agricultural Code provides a reasonably definite standard to guide the director of agriculture in establishing marketing areas for the marketing of fluid milk, there is no delegation of legislative power to the director in the performance of his duties respecting the establishment of marketing areas throughout the state.

This section also provides that the director may establish additional areas and may modify existing areas when he deems it necessary to do so. In establishing new areas, or in modifying existing areas, the director would be guided by the same standard as that fixed for his guidance in establishing original areas—that is, uniformity of marketing conditions in the fluid milk industry. The question as to the establishment of new areas, or the modifying of existing areas, is not before us in the present proceeding as it is not

alleged in the complaint that the director has either established new areas or has modified existing areas.

The next contention made is that section 736.1 is unconstitutional in that it attempts to confer upon the director of agriculture, legislative power in the formulation of a stabilization and marketing plan for an area after an area has been established by the director as provided by section 736 of the Agricultural Code. It is contended that neither in section 736.1, nor in any other section of the code, has any standard been provided for the guidance of said director in the formation of such a plan. A careful reading of this section of the code convinces us that this contention cannot be sustained. The director of agriculture by this section is required to act in two instances. After he has determined that the required percentage of milk producers in any area desire that a stabilization and marketing plan be formulated, the director must find that such a plan is "necessary to accomplish the purposes of this chapter". He then formulates a plan and submits it at a hearing to the milk producers of the area for the purpose of determining whether the proposed plan will accomplish the purposes desired. The section then provides that, "If, after public hearing the director determines that the proposed plan will tend to accomplish the purposes of this chapter within the standards herein prescribed, he shall issue an order" declaring the plan in effect after 30 days from the date of said hearing. It will be noted that in each of the two instances in which the director is required to act, he can only act after finding that the proposed plan is necessary in one instance, and in the other, that it tends to accomplish "the purposes of said chapter". It is argued that the "purposes of this chapter" are too indefinite and uncertain to constitute a standard or guide to the director in acting either in determining that a plan is necessary for the area, or that the plan proposed by him will accomplish the required purposes. Generally speaking, this argument would have considerable force, but in the present instance, we are of the opinion that we cannot follow it. Section 735.1 of the Agricultural Code sets out definitely and specifically the "purposes of said chapter". No uncertainty can exist as to what was intended by the words, "purposes of this chapter" as they are explicitly defined in section 735.1. They are four in number and are designated as, a, b, c, and d.

It is not necessary to set them out again at this time, as the entire section has already been quoted herein.

The situation here is much like that found to exist in the Agricultural Prorate Act which provides that a prorate plan after its preparation by the prorate program committee must be approved by the prorate commission, and that the commission, before approving it, "must find that the same is reasonably calculated to maintain the existence of the facts specified in Section 10 hereof". It was contended that the Prorate Act giving the commission the authority to put into effect a prorate plan was a delegation of legislative power to the committee as no standard was fixed by the act to guide the committee in the preparation of such a plan. We held, however, that "Section 10 of the act sets forth seven essential facts which must be made to appear before any prorate district or zone is organized. These seven basic facts are the very foundation of every proceeding for the formation of a prorate district, and every one of them must be found by the commission to exist, or the petition must be denied. As the program must conform to these legislative requirements, we think it cannot be said that no standard has been provided by the legislature to guide the program committee in framing a proposed program." (*Agricultural Prorate Com.* v. *Superior Court, supra,* p. 569.) So under section 736.1 of the Agricultural Code, the director must in the first instance find that a stabilization and marketing plan is necessary to accomplish the purposes of said chapter as set forth in section 735.1 of the act, before he formulates any plan, and after it has been formulated, at a hearing of which the milk producers and distributors in the area are given notice, he must determine whether the plan proposed meets the standards fixed by said section of the code defining the "purposes of said chapter".

It is also contended that section 736.1 is unconstitutional in that it is not uniform in its operation in respect to the producers of milk and cream, who are to have a voice in determining whether a stabilization and marketing plan is desired by the producers in any particular area. By reading said section, it will be noted that only those producers of fluid milk or fluid cream, whose major interest is in the production of fluid milk or fluid cream, are permitted to participate in the hearing to determine whether sixty-five per cent of the producers desire that a stabilization plan be

formulated, and in case a petition to the director is presented asking for the promulgation of such a plan, it needs to be signed by sixty-five per cent of only those producers *whose major interest is in the production of milk and cream.* There are at least two possible constructions that may be given to these italicized words. Respondents and *amici curiae* contend that they mean those producers whose major interest is in the production of milk rather than in the production of other commodities, or those producers whose major interest is in the production of milk, as compared with their interest in other lines of business. As an example of this first class, they cite the owner of a large farm or ranch devoted to the raising of fruit, grain, horses, cattle, and other farm products. He also maintains a dairy, and produces large quantities of milk and cream which he sells to the trade. But his dairy is only a small part of the business transacted by him on his farm or ranch. In fact, the production of milk is only a minor interest when compared with the business transacted by him on his entire farm. An example of the second class would be an individual of large means, or a large corporation, owning extensive interests in bank, mining, and farming, including a dairy which produces large quantities of milk and cream which is sold to the trade. But this dairy business constitutes only a very small per cent of this business interest as a whole, and the production of milk and cream is only a minor interest when compared with the entire business transacted. Under respondents' construction of the phrase, "whose major interest is the production of milk and cream", these two classes of producers would be excluded from having any voice in deciding whether a stabilization plan in the area for which they produce milk and cream is desirable. Under such a construction, the section would be subject to the charge of unconstitutionality on the ground that it does not operate uniformly upon all persons engaged in the business of producing milk and cream. We can think of no reason which would have induced the legislature to enact such a statute if it be given the construction placed upon it by the respondents and *amici curiae*. It would, in fact, be an absurd legislative act. No reason has been suggested to us, and we have not been able to discover any reason, why the legislature would exclude the two classes of producers which we have just described, and perhaps others, from all the

rights and privileges enjoyed by other producers whose interests are identical with those of the two excluded classes. To so construe this language of the section would render the section unconstitutional on the ground of lack of uniformity. If, therefore, there is any other reasonable construction which can be given to these words of the section, and which will render it harmonious with the Constitution, it is the duty of the court to adopt such construction. (5 Cal. Jur., p. 615.) We shall, therefore, turn to the construction which the attorney-general contends is the proper construction to be placed upon the words, "whose major interest is in the production of milk and cream".

Preliminary to the consideration of the contention of the attorney-general as to the construction to be given to the phrase in question, we would call attention to the provision of section 736.1, in which said phrase is found, that the purpose of the proposed hearing, and the purpose of the petition provided for in said section, is to determine whether sixty-five per cent of the producers desire a stabilization plan formed in the area for which they furnish milk and cream. Three classes of persons are interested primarily in the milk industry, the producers, the distributor, and the consumer. These terms are defined in section 735.3 of the Agricultural Code as follows: The "producer" means "any person who produces fluid milk or fluid cream in conformity with the applicable health regulations", etc. The "consumer" means "any person who purchases fluid milk, fluid cream or dairy products for consumption". The "distributor" means "any person whether or not such person is a producer, or an association of producers, engaged in the distributing or handling fluid milk or fluid cream for sale . . . " By this section of the code a distributor is one engaged in the distribution of milk *and includes producers who are also engaged in the distribution of milk.* By this section of the code, producers are of two classes—one class engaged solely in the production of milk, and the other class engaged both in the production and in the distribution of milk. ▮▮▮ The contention of the attorney-general is that when the phrase, "producers of milk whose major interest is in the production of milk" is used in section 736.1, the legislature had in mind those producers who were also engaged in the distribution of milk, and provided that only those producers "whose major interest is in the production of milk", in

comparison with their interest in the distribution of milk should be entitled to participation at the hearing to determine whether a stabilization plan should be promulgated by the director of agriculture. It cannot be questioned, we think, that such a construction of the words in said phrase is justified when this section is read in conjunction with the definitions given to "producer" and "distributor" in section 735.3 of said code. As so construed, it would include the farmer who is engaged in diversified farming, including the operation of a dairy, although his dairy interest may be small when compared with his other farming interests. It would also include the producer who carries on a dairy business in connection with his other business activities, although his dairy business may be only a minor interest in comparison with his business as a whole. In fact, such a construction would include all producers of milk and cream except those large distributors of milk and cream who also engaged in the business of producing milk on a small scale as compared with their distribution business. We see nothing unreasonable in so construing the phrase in question. In fact such a construction appears to us to be entirely justified and reasonable. ▮▮ "Where the language of a statute is reasonably susceptible of two constructions, one which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted." (23 Cal. Jur., p. 766.) And as so construed, section 736.1 cannot be held to lack uniformity of operation as it affects all producers of milk whose primary interests would be directly affected by the establishment of a marketing plan.

▮▮ It may be contended that a producer whose interest in the production of milk is a minor interest in comparison with his distributing business, also has an interest in the outcome of the hearing to determine whether a stabilization plan is to be promulgated in the area for which he furnishes milk. Conceding that to be so, his interest is basically different from that of the producer who is not a distributor, and whose major interest is in the production rather than the distribution of milk. In fact, the interest of the former would naturally be adverse to the interest of the latter. The distinction between producers whose major interest is

in the production of milk and those whose major interest is in the distribution of milk rests upon a natural and intrinsic difference between the two classes, and a statute which affects one of these classes, and does not affect the other, cannot be held to be unconstitutional by reason of its lack of uniformity.

The only purpose of this hearing is to ascertain whether the producers in the area desire a stabilization plan promulgated by the director. If, at this hearing, the director finds that the promulgation of such a plan is necessary to accomplish the purposes "of this chapter", he formulates a plan and gives notice of a public hearing to producers and distributors alike to determine whether the proposed plan will accomplish the purpose desired. The first hearing, that is, the one at which producers only are entitled to participate, is only preliminary to this second hearing at which the plan proposed by the director is adopted. As all producers and distributors have the right to participate in the final meeting at which the plan is adopted, none can complain that he is deprived of any right without an opportunity to be heard.

Respondents make the contention that there is no definite rule in the act as to the fixing of prices to the producers. This subject is governed by the provisions of section 736.12 of the Agricultural Code, and the only authority cited in support of the claim here made is the case of *Balzer* v. *Caler*, (Cal. App.) 74 Pac. (2d) 439. That case after decision by the District Court of Appeal was transferred to this court. In our decision, we arrived at an entirely opposite conclusion from that of the District Court of Appeal. (*Balzer* v. *Caler*, 11 Cal. (2d) 663 [82 Pac. (2d) 19].) The opinion, therefore, of the District Court of Appeal having been set aside by said transfer is of no authoritative value.

Respondents' criticism of this section is particularly and specifically directed to subdivision (1) of said section under the heading of "Establishment and declaration of prices: Restrictions". This subsection provides for the fixing of prices in the several marketing areas in the state. Respondents complain that there is no definition in the act of an area and nothing to determine of what an area shall consist. Section 736 provides for the designation of marketing areas in the several parts of the state, and we have already discussed the validity of that section, and what we have there

said answers the present criticism of respondents respecting the formation of areas.

 Amici curiae also attack as unconstitutional section 737.5 (a) of said code on the ground that it is an unlawful delegation of legislative power to the director of agriculture. Section 737.5 provides in part that "(a) After thirty days after the effective date of this chapter, no distributor shall deal in fluid milk or fluid cream without first having obtained a license from the director." It is contended that this section provides no standard by which the director may be guided in issuing licenses to distributors. Section 735.3, as we have seen, defines "distributor". The definition in part is as follows: "'Distributor' means any person whether or not such person is a producer or an association of producers, engaged in the business of distributing or handling fluid milk or fluid cream for sale," etc. As the section explicitly defines a distributor, we apprehend that any person who comes within the terms of this definition would in the first instance be entitled to a license as a distributor, unless a complaint was filed against the issuance of said license as provided by section 737.11. (*Highland Farms Dairy* v. *Agnew*, 16 Fed. Supp. 575, 584.) In that opinion it is stated under a somewhat similar act, "In the absence of provision to the contrary, it would appear to be the duty of the board to issue a license until some violation of the act or of a regulation or order had taken place. Such a standard would be sufficient to sustain the act, although less specific in detail than other similar statutes."

These two sections 737.5 and 737.11, should be read together, and when so read, it will be found that they afford adequate standards not only to guide the director in refusing an application for a license but also in revoking or suspending licenses already issued. Section 737.11 reads in part as follows: "(a) The director may refuse to grant any license herein provided and may, after due hearing upon a verified complaint signed and filed with the director by any interested person, revoke or suspend any such license as the case may require, when he is satisfied that any *applicant* or licensee has violated any provision of this chapter, or any provision of any stabilization and marketing plan formulated under the provisions of this chapter." It will be noted that this section refers to an *applicant* for a license as well as to a *licensee*. As we construe this section, the

applicant may not be granted a license if the director finds, after a hearing, that he has violated any of the provisions of the chapter or any plan promulgated thereunder. He may also revoke or suspend a license for the same reason.

It is contended by *amici curiae* that that portion of section 737.11 (a) which provides for a hearing after complaint filed only applies to proceedings for the revocation or suspension of a license and does not apply to the granting of a license. We concede that the section is not as clear as it might be, but the inclusion of the word ''applicant'' in the section clearly implies that the proceedings therein provided for applies to a person applying for a license as well as a licensee whose license is sought to be revoked or suspended. Subsection (b) of this same section confirms our conclusion that this section applies both to an applicant for a license, as well as to a licensee, as it is therein stated that ''such decision [the decision rendered after the hearing provided for in subsection (a) of said section] may include an order *refusing*, revoking or suspending *the license applied for* or held by respondent''. As we construe these sections, they provide that a license may not be granted by a director after a complaint filed, if after a hearing held upon said complaint, the director finds that the applicant has violated either the terms of the act or the provisions of an established marketing plan. It cannot be said, therefore, that the granting or refusing of a license is left to the arbitrary whim of the director, as a license to any applicant, if complaint is made against its issuance, can only be granted after the hearing provided in section 737.11 (a) of said code, and a finding made in favor of the applicant.

The same parties attack that portion of said section which provides that, ''Such findings and order may determine the amount of damage, if any, to which a complainant is entitled as a result of a failure of the distributor to pay for fluid milk or fluid cream as in this chapter provided, and in such case the director may make an order directing the offender to make reparation and pay to such person complaining such amount on or before the date fixed in the order.'' It is contended that by this provision of said section the legislature has attempted to clothe the director with judicial power, and that the provision is unconstitutional for that reason. There can be no answer to this contention. No cita-

tion of authority is necessary to support the same. While the attorney-general does not concede the invalidity of this provision of said section, he makes no attempt to defend its constitutionality, and we must therefore assume that he recognizes the serious defect in this provision of said section. But even if said provision is contrary to the terms of the Constitution, its invalidity can in nowise affect the remaining valid provisions of said chapter 10. Section 738 of said chapter provides that if any portion of said chapter shall be held to be unconstitutional, such decision shall not affect the validity of the remaining portions thereof.

Section 736.3 of the Agricultural Code provides for various "provisions" to be contained in any stabilization and marketing plan promulgated by the director of agriculture, some of which are optional. Among the provisions required to be included in such a plan, and which we may designate as mandatory, is the following: "(b) Minimum prices. Provisions whereby the director designates and prescribes or provides methods for designating or prescribing minimum prices to be paid by distributors to producers, for fluid milk in one or more of the various classes; provided, however, that the prices so designated or prescribed shall be based upon the economic relationship of the price of fluid milk for the marketing area involved to the price of manufacturing milk, taking into consideration the additional costs incurred in producing and marketing fluid milk over and above costs incurred in producing and marketing manufacturing milk; and provided further, the director finds that such prices will tend to effectuate the purposes and policy of this chapter and will insure consumers a sufficient quantity of pure and wholesome milk."

*Amici curiae* criticize this provision of said section on the ground that it confers upon the director of agriculture authority to fix the minimum prices to be paid by distributors to producers for fluid milk in the various areas throughout the state without providing any adequate standard by which the director is to be guided in fixing said minimum prices. They concede that this section (sec. 736.3 [b]) does provide "that the prices so designated or prescribed shall be based upon the economic relationship of the price of fluid milk for the marketing area involved to the price of manufacturing milk, taking into consideration the additional cost incurred

in producing and marketing fluid milk over and above costs incurred in producing and marketing manufacturing milk; and provided further, the director finds that such prices will tend to effectuate the purposes and policy of this chapter, and will insure consumers a sufficient quantity of pure and wholesome milk''.

Undoubtedly the legislature by this last-quoted provision of said section has attempted to fix certain standards which the director is required to follow in fixing minimum prices for fluid milk to be paid to the producers by the distributors. We have in a previous part of this opinion called attention to the division by the legislature of the milk industry into two classes—one class including all those engaged in the producing, distribution and consumption of market milk, and those similarly interested in manufacturing milk. We further called attention to certain provisions of the Agricultural Code respecting the production and preparation of market milk before it could be sold ''to the retail trade''. We also pointed out certain conditions under which market milk, in order to be fresh and wholesome, must be furnished to the consumer. The strict requirements under which market milk must be produced and prepared before the same is permitted to be sold ''to the retail trade'' and the conditions which naturally govern the distribution of such a perishable and unstable article do not in any way apply to or affect manufacturing milk. Manufacturing milk therefore may be produced and sold at a much lower price than market milk.

In designating the minimum price of market milk it is required that the price so designated shall be based upon the ''economic relationship of the price of fluid milk for the marketing area involved to the price of manufacturing milk''. It is contended that the term, ''economic relationship'' is indefinite and too uncertain to form any standard by which the director may be guided in fixing the minimum price to be paid for fluid milk. This term is not defined in any provision of the Agricultural Code, and we have been unable to bring to light any judicial interpretation of its meaning. We think, however, that the section itself fairly indicates what was in the mind of the legislature in the use of the term, ''economic relationship''. It provides that the minimum price of fluid milk, so designated by the director, shall be based upon the economic relationship of the price

of fluid milk to the price of manufacturing milk (by) "taking into consideration the additional cost incurred in producing and marketing fluid milk over and above costs incurred producing and marketing manufacturing milk". We have inserted the preposition, "by" in the sentence not for the purpose of changing its meaning, but possibly to make its meaning clearer. As thus read, this provision simply means that the price designated to be paid to producers by distributors for market milk shall be based upon the relative costs incurred in producing and marketing fluid milk to the cost of producing and marketing manufacturing milk. It was evidently the purpose of the legislature to stabilize the milk industry in the distribution of these two classes of milk so that there would be a sufficient quantity, but not an oversupply of each class. For, if the minimum price of fluid milk be fixed too low, then the producers would not go to the expense necessary to meet the health and sanitary requirements of fluid milk and would dispose of their product as manufacturing milk, and there would not be a sufficient supply of wholesome milk for the use of consumers. On the other hand, if the price of fluid milk be fixed too high, the effect would be to increase unduly the supply of fluid milk with the result that many producers would be unable to market their product, and for that reason would be forced out of business. Such a result might, and probably would, endanger an adequate supply of fresh milk to meet the needs of consumers. Evidently the legislature considered the condition of the milk industry in this respect a real menace not only to those engaged therein but to the consumers who depended on milk and cream as absolute necessary articles of food. We cannot say that this condition does not now, or at least at the time of the enactment of said section did not, exist, nor can we deny the power of the legislature to remedy the evil, provided it proceeded along constitutional lines. Having given the director the power to fix the minimum price of fluid milk, and having provided that in so fixing said price he shall take into consideration the additional cost of producing and marketing fluid milk over and above the costs incurred in producing and marketing manufacturing milk, the legislature has not left the fixing of the price of fluid milk to the unrestrained or arbitrary discretion of the director, but it has

established a standard which he is to follow in the exercise of this power.

Section 736.3 (b) providing that the minimum price of fluid milk designated by the director shall be based upon the economic relationship of fluid milk to the price of manu- facturing milk by taking into consideration the difference in the cost of producing and marketing these two classes of milk is like in principle to the so-called ''flexible tariff'' provision of the Tariff Act of 1922 by which the president was author- ized to change the tariff rates to equalize differences in cost of production between articles manufactured in this country and those manufactured abroad. The standards thus estab- lished were held to be sufficient and the Tariff Act was upheld as not constituting any unlawful delegation of legislative power. (*Hampton, Jr., & Co.* v. *United States,* 276 U. S. 394 [48 Sup. Ct. 348, 72 L. Ed. 624].) Similar holdings are to be found in the following cases: *Field* v. *Clark,* 143 U. S. 649 [12 Sup. Ct. 495, 36 L. Ed. 294], *Federal Radio Com.* v. *Nelson Bros. Bond & Mortg. Co.,* 289 U. S. 266 [53 Sup. Ct. 627, 77 L. Ed. 1166, 89 A. L. R. 406], and *Federal Trade Com.* v. *Raladam Co.,* 283 U. S. 643 [51 Sup. Ct. 587, 75 L. Ed. 1324, 79 A. L. R. 1191].

It will be noted that in designating the minimum price to be paid to the producer for fluid milk under section 736.3 (b), quoted above, two further standards are prescribed for the guidance of the director. They are: (1) That the director finds that such prices will tend to effectuate the ''purposes and policy of this chapter'', and, (2) ''Will insure consumers a sufficient quantity of pure and wholesome milk.'' Each of these two additional standards must be complied with by the director in fixing the minimum price to be paid to the pro- ducer, and if either is found too indefinite or uncertain to serve as a guide to the director, then the section cannot be sustained. We need spend but little time in the discussion of the first of these standards, as we have already considered and held valid a similar provision to be a sufficient standard for the director's guidance in our consideration of section 736.1, and what is said there applies with equal force to the requirement in the present section that the director must find that the prices so fixed by him will ''tend to effectuate the purposes and policy of this chapter''. The only difference in the phraseology of the two expressions is that in section 736.3 (b) the words, ''purposes and policy of this chapter''

are used, while in section 736.1, the expression is confined to the "purposes of this chapter". We do not think that the addition of the words "and policy" adds anything to the former expression, as "purposes" and "policy" in the sense used in these two sections are synonymous.

*Amici curiae*, who question the sufficiency of these two standards concede that the second standard which provides that the director shall find that the prices so fixed "will insure consumers a sufficient quantity of pure and wholesome milk", is "more concrete and understandable, and that if the other standard were sufficient, this at least would be understandable". Having held the other standards sufficient, under this concession of *amici curiae*, we would feel justified in holding the second of these standards both understandable and sufficiently certain to serve as a guide to the director in discharging his duty under that section of the act. We can see nothing uncertain or indefinite respecting a requirement that the prices fixed for the sale of milk shall be such that they "will insure consumers a sufficient quantity of pure and wholesome milk".

The respondents and *amici curiae* cite with considerable assurance the case of *In re Peppers*, 189 Cal. 682 [209 Pac. 896], in support of their claim that this and various other sections of the Agricultural Code hereinbefore discussed confer legislative power upon the director without adequate or proper standards to direct him in the execution of the powers conferred upon him. In the Peppers case, the act under which the shipper was being prosecuted (The California Fruit and Vegetable Standardization Act [Stats. 1921, p. 1234]), declared that "oranges shall be considered unfit for shipment, when frosted to the extent of endangering the reputation of the citrus industry, if shipped". This provision, the court pointed out, did not purport to forbid the shipment of all frosted oranges, but only those frosted to the extent of endangering the reputation of the citrus industry, if shipped. The court then asks the pointed question, "How is the producer whose oranges have been touched with frost to know, from the terms of this act, whether or when he will be violating it in offering his fruit for shipment?" The court then concludes that this provision of the act, "is too vague, indefinite and uncertain to furnish the basis of a criminal prosecution". It further held that other provisions of the

act, if they attempted to confer upon the department of agriculture the power to make more certain the clause of said act declaring that "oranges shall be unfit for shipment when frosted to the extent of endangering the reputation of the citrus industry, if shipped", were unconstitutional, as "the legislature had no power to thus delegate to an administrative board or officer its *exclusive* power and function of determining what acts or omissions on the part of an individual are unlawful". In other words, that opinion held that the legislature had attempted to make it a criminal offense to ship oranges under certain conditions which the court held were so uncertain that it was impossible for the shipper to know "whether or when" he was violating the statute. The court held the provision of the statute void. It was then claimed that the legislature had conferred upon the director of agriculture the power to make more certain the language of the act making it a crime to ship oranges under the conditions prescribed in the statute, and in answer to this claim, the court held that it was the exclusive power and function of the legislature to determine what act of the individual was illegal, or in other words, criminal. No like questions are present in the proceeding now before us.

We are, therefore, of the opinion that there is nothing to be found in the decision of the Peppers case contrary to the conclusions heretofore expressed by us in the present proceeding. The standard there prescribed for the guidance of the shipper was obviously so uncertain and indefinite that he was unable to follow it in the shipment of his fruit. Those standards which are prescribed by the sections of the Agricultural Code to which exception has been taken, and which we have discussed, are for the guidance in every instance of the director of agriculture in the performance of the several duties enjoined upon him by the act. ▆▆▆ While it may be that in some instances the provision prescribing the standard is not free of doubt as to its precise meaning, yet that fact furnishes no legal reason for declaring the act unconstitutional. "If there is doubt, the expressed will of the legislature should be sustained." (5 Cal. Jur., p. 630.) Again on the same page of this volume of California Jurisprudence, we find the following statement supported by numerous authorities, "It is the repeated declaration of the courts that they will not annul, as contrary to the Constitu-

tion, a statute passed by the legislature, unless it can be said of the statute that it positively and certainly is opposed to the Constitution.''

 The practice of delegating to administrative officers or boards powers which were originally performed directly by the legislature is of long standing and has met the approval of the highest courts in this state as well as in other jurisdictions. ''The policy of the law favors the placing of detailed responsibility in administrative officers. The courts uphold statutes vesting such powers in such officers if it is possible fairly to do so, at least where the powers are merely ministerial. In order to justify the courts in declaring a statute imposing particular duties or conferring authority upon administrative officers to be inoperative as a delegation of legislative power, it must clearly appear beyond a reasonable doubt that the duty or authority so imposed or conferred is one appertaining exclusively to the legislative department and that the delegation of it is not warranted under the provisions of the Constitution.'' (11 Am. Jur., p. 955.)

In the recent decision of this court entitled *East Bay Municipal Dist.* v. *Department of Public Works,* 1 Cal. (2d) 476 [35 Pac. (2d) 1027], we find the following statement of the law as announced in *Gaylord* v. *City of Pasadena,* 175 Cal. 433, 436 [166 Pac. 348], cited with approval, '' 'It has become increasingly imperative that many *quasi*-legislative and *quasi*-judicial functions, which in smaller communities and under more primitive conditions were performed directly by the legislative or judicial branches of the government, are entrusted to departments, boards, commissions, and agents. No sound objection can longer be successfully advanced to this growing method of transacting public business. These things must be done in this way or they cannot be done at all, and there doing, in a very real sense, makes for the safety of the republic, and is thus sanctioned by the highest law. For as the Supreme Court of the United States declares: ''Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends, would be 'to stop the wheels of government' and bring about confusion, if not paralysis in the conduct of the public business.'' ' ''

659

For additional authorities supporting this statement, see cases cited in the opinion in the case of *East Bay Municipal Utility Dist.* v. *Board of Public Works, supra.*

This statement of the law also answers the contention of the respondent and *amici curiae* that in a number of instances judicial power is conferred upon the director of agriculture in that he is empowered to hold hearings at which evidence is produced and findings of fact are made by him.

In the case of *Globe Cotton Oil Mills* v. *Zellerbach,* 200 Cal. 276, 277 [252 Pac. 1038], it was held the granting of power to the Fish and Game Commission to hold hearings and determine the facts incidental to the regulation of the fish and game and to the granting of permits to take and use fish, was valid as an administrative or regulatory power, and in nowise transgressed upon the exclusive functions of the judicial department. This ruling is supported by *People* v. *Sacramento Drainage Dist.,* 155 Cal. 373, 387, 388 [103 Pac. 207], and *Tarpey* v. *McClure,* 190 Cal. 593, 606 [213 Pac. 983].

We, therefore, conclude that, with the exception of the provision in section 737.11 (b) of said chapter 10, division IV, which purports to give to the director the power to fix the amount of damages to which a complainant is entitled for the failure of a distributor to pay for fluid milk or fluid cream purchased of a producer, none of the provisions of said chapter which has been called to our attention by either the respondent or *amici curiae* is invalid by reason of the alleged delegation of either legislative or judicial power to the director of agriculture.

We have already considered the effect of the invalidity of this provision of section 737.11 (b) upon the other provisions of said chapter, and have shown that it does not in any way render invalid the remaining valid portions of the act.

Legislation which has for its purpose the regulation and stabilization of the milk industry, even to the extent of fixing prices for which milk may be bought and sold, is not any new development in our social legislation. While it is of recent enactment in this state, it has been in force in other states for many years last past. It has been, with few exceptions, upheld by the courts of the various sections of this country, including the United States Supreme Court and the highest appellate courts of the following states: Illinois, Iowa, New York, Virginia, Alabama, Arizona, Arkansas,

Florida, Georgia, Indiana, Pennsylvania, Wisconsin, Massachusetts, and New Jersey. A list of the cases in these respective jurisdictions where the validity of such statutes have been upheld is to be found in the following volumes of the American Law Reports, 101 A. L. R. 64, 110 A. L. R. 644, and 119 A. L. R. 243. We deem it unnecessary, and it would prolong this opinion, already beyond reasonable length, to even enumerate, much less analyze these scores of adjudicated cases. From the reference above they may be easily consulted by anyone desiring to further pursue this subject.

*Amici curiae* have called to our attention the following four cases which have held milk control statutes unconstitutional: *Van Winkle* v. *Fred Meyer, Inc., supra, Maryland Cooperative Milk Producers* v. *Miller,* 170 Md. 81 [182 Atl. 432], *Ferretti* v. *Jackson,* 88 N. H. 296 [188 Atl. 474], and *Griffiths et al.* v. *Robinson,* 181 Wash. 438 [43 Pac. (2d) 977]. The case of *Van Winkle* v. *Fred Meyer, Inc., supra,* has already been shown to be inapplicable, and we refused to follow it, and the case of *Griffiths et al.* v. *Robinson, supra,* in the case of *Agricultural Prorate Com.* v. *Superior Court,* 5 Cal. (2d) 550, 571 (*supra*). We deem it unnecessary to attempt to differentiate the two other cases relied upon by *amici curiae,* for even if they were found to be applicable and to contain rulings contrary to the many other cases which we have referred to which uphold the constitutionality of the milk control statutes, they are so hopelessly in the minority that we would not feel justified in following them. It appears, therefore, that the great weight of judicial authority sustains the constitutionality of legislation of the character now before us and is in harmony with our views as hereinbefore expressed. We are, therefore, of the opinion that chapter 10, article IV of the Agricultural Code is a valid constitutional enactment except in the one particular above noted, the excepted provision, however, not affecting the main body of said act.

The judgment is reversed with directions to the trial court to sustain the general demurrer of defendant and enter judgment in his favor.

Waste, C. J., Shenk, J., Langdon, J., Houser, J., and Seawell, J., concurred.