[L. A. No. 20902.   In Bank.   Sept. 13, 1950.]

PEDRO ESCOBEDO, Petitioner, v. STATE OF CALIFORNIA, DEPARTMENT OF MOTOR VEHICLES et al., Respondents.

David C. Marcus for Petitioner.

Fred N. Howser, Attorney General, Walter L. Bowers, Assistant Attorney General, and E. G. Funke, Deputy Attorney General, for Respondents.

SCHAUER, J.—Petitioner asks that this court by mandate direct respondents, the Department of Motor Vehicles and the Director of Motor Vehicles of this state, to "re-issue, return or reinstate Petitioner's operator's license and/or driving privileges to operate a motor vehicle in this State." In September, 1948, respondents, without according petitioner a hearing, suspended his operator's license under the then provisions of sections 419 through 420.9 of the Vehicle Code (Stats. 1947, ch. 1235). These provisions constituted chapter 3 of division VII of the code, entitled "Security Following Accident"; they became operative July 1, 1948.[1] It is petitioner's position that the application of this law to him denied him due process and equal protection (U.S. Const., Amendment XIV, § 1; Cal. Const., art. I, §§ 11, 13) and vested judicial power in "a purely ministerial 'department' " in violation of the state Constitution (art. III, § 1; art. VI, § 1). We have concluded that petitioner's contentions should not be sustained and that upon the showing made the suspension of his license is legally tenable.

On July 1, 1948, petitioner held a valid license to drive a motor vehicle in California; on that date he operated a vehicle which was involved in a collision with another such vehicle at an intersection of public highways in this state. In August, 1948, petitioner received from respondents a written notice stating that because of the July 1 accident and because petitioner had "failed to otherwise meet the security requirements of Section 420 of the Vehicle Code,"

---

[1]Effective July 7, 1949, the chapter was completely recast (although its general plan remains the same) by amendment of section 419, repeal of sections 420 through 420.9, and addition of new sections 420 through 423.1 (Stats. 1949, ch. 834).

he was required to deposit with respondent department, on or before September 11, 1948, security in the sum of $2,800. The notice further stated that petitioner's "driving privilege and all licenses evidencing such privilege is [sic] hereby suspended as of" September 11, 1948, unless the deposit was made prior to that date, and that the suspension would "remain in effect until evidence satisfactory to the Department has been filed indicating that the security requirements of Section 420.2 of the Vehicle Code have been met." Petitioner is a gardener by occupation and "requires the use of his automobile" and his license to operate it in order to "transport himself and his tools between his different places of employment . . . and to earn a livelihood for himself and his family [dependent wife and nine minor children]." He does not have $2,800 "or any like sum" to post as security, is unable to and did not post the security demanded by respondents and, pursuant to the provisions of section 420 of the Vehicle Code, his operator's license was and now is suspended. The Highway Patrol has notified petitioner "that they intend to arrest and prosecute" him under the provisions of subdivisions (a) and (d) of section 338 of the Vehicle Code, which forbid possession of, and failure to surrender to the department on lawful demand, a suspended license.

The applicable provisions of chapter 3 of division VII of the Vehicle Code (Stats. 1947, ch. 1235) which were in effect at the time of petitioner's accident and the suspension of his license are as follows:

Section 419 required that the operator of a motor vehicle involved in an accident in this state which resulted in personal injury, death or property damage exceeding $100 report the matter in writing to the Department of Motor Vehicles within 10 days after the accident. Section 420 (subd. (a) ) provided that "The department shall, within 60 days after the receipt of a report of [such] a motor vehicle accident . . . suspend the license of each operator . . . involved in such accident . . . unless such operator shall deposit security in a sum which shall be sufficient in the judgment of the department to satisfy any judgment or judgments for damages resulting from such accident as may be recovered against such operator. Notice of such suspension shall be sent by the department to such operator not less than 10 days prior to the effective date of such suspension and shall state the amount required as security." The deposit of security and suspension of license

requirements did not apply if the operator or owner of the vehicle had an automobile or other public liability policy or bond covering $5,000 for injury or death of one person, $10,000 for injury or death of more than one person, and $1,000 property damage (Veh. Code, § 420, subds. (b), (c) ), or to a person who had more than 25 vehicles registered in his name and qualified as a self-insurer (Veh. Code, § 420, subd. (b), par. (4), § 420.7) ; other situations in which the requirements did not apply are not here material. Suspension of license was to continue until security was deposited, or one year had passed without filing of an action for damages arising out of the accident, or until release from or satisfaction of liability, or final adjudication of nonliability. (Veh. Code, § 420.2.)

Specifically, petitioner urges that the above quoted or summarized sections of the Vehicle Code were unconstitutional in the following respects:

1. The statute violated the due process provisions of the federal Constitution (Amendment XIV, § 1) and the state Constitution (art. I, § 13) in that no provision was made for hearing before the department, or for recourse to the courts, before suspension of a license.

2. Judicial power was delegated to an admistrative body in violation of the state Constitution (art. III, § 1; art. VI, § 1), in that no sufficient standard was provided to guide the department in determining the amount of security.

3. The effect of the statute was an arbitrary discrimination in violation of the equal protection clause of the federal Constitution (Amendment XIV, § 1) and the uniform operation of laws provision of the state Constitution (art. I, § 11) in that: (a) The posting of security by a driver who might not be culpable was required, before his liability was judicially determined. (b) Those who were financially able to carry insurance or post security were favored as against those who were not. (c) The provisions permitting any person in whose name more than 25 motor vehicles were registered to qualify as a self-insurer created an arbitrary classification.

### Hearing, Due Process

There was no express provision in sections 419 through 420.9 of the Vehicle Code (Stats. 1947, ch. 1235) concerning hearing before determination by the department that security must be deposited or the operator's license suspended. At the time petitioner's license was suspended without hearing,

section 315 of the Vehicle Code (Stats. 1947, ch. 431) provided that ''A person shall be entitled to demand in writing a hearing before the director or his representative whenever the department . . . [h]as given notice of the suspension . . . of his privilege of operating a motor vehicle upon a highway or of an operator's . . . license issued to such person,'' but it further provided that ''The . . . licensee shall not be entitled to a hearing under this section whenever such action by the department is made mandatory upon the department by the provisions of this code.''[2]   Since suspension of petitioner's license for failure to deposit security was mandatory (Veh. Code, § 420) whenever it had been determined that a motor vehicle accident had occurred and damages exceeding $100 ensued which probably might result in ''a judgment or judgments for damages . . . recovered against such operator,'' it is apparent that it was not contemplated that the department necessarily should give an operator opportunity to be heard before it determined the amount of security required and notified him that his license would be suspended unless he deposited such sum.   Thus we have for decision an aspect of the question expressly left open in *Ratliff* v. *Lampton* (1948), 32 Cal.2d 226, 233 [195 P.2d 792, 10 A.L.R.2d 826] : ''Whether such summary procedure might be justified under the police power . . . in some instances . . .''

Fundamentally it must be recognized that in this country ''Highways are for the use of the traveling public, and all have . . . the right to use them in a reasonable and proper manner, and subject to proper regulations as to the manner of use.''   (13 Cal.Jur. 371, § 59.)   ''The streets of a city belong to the people of the state, and the use thereof is an inalienable right of every citizen, subject to legislative control or such reasonable regulations as to the traffic thereon or the manner of using them as the legislature may deem wise or proper to adopt and impose.''   (19 Cal.Jur. 54, § 407.) ''Streets and highways are established and maintained primarily for purposes of travel and transportation by the public, and uses incidental thereto.   Such travel may be for either business or pleasure . . . The use of highways for purposes of travel and transportation is not a mere privilege, but a common and fundamental right, of which the public and

---

[2] In 1949 sections 314-316 of the Vehicle Code, concerning notice, hearing, etc., were repealed and new provisions (§§ 314-319.1) concerning these subjects were enacted (Stats. 1949, ch. 1467).

individuals cannot rightfully be deprived . . . [A]ll persons have an equal right to use them for purposes of travel by proper means, and with due regard for the corresponding rights of others.'' (25 Am.Jur. 456-457, § 163; see, also, 40 C.J.S. 244-247, § 233.) Notwithstanding such general principles characterizing the primary right of the individual, it is equally well established (as is recognized in the texts above cited) that usage of the highways is subject to reasonable regulation for the public good. In this connection, the constitutionality of various types of financial responsibility laws has been often upheld against contentions that they violated the due process clause of the Fourteenth Amendment. ''The use of the public highways by motor vehicles, with its constant dangers, renders the reasonableness and necessity of regulation apparent. The universal practice is to register ownership of automobiles and to license their drivers. Any appropriate means adopted by the states to insure competence and care on the part of its licensees and to protect others using the highway is consonant with due process.'' (*Reitz* v. *Mealey* (1941), 314 U.S. 33, 36 [62 S.Ct. 24, 86 L.Ed. 21, 24]; see, also, *State* v. *Price* (1937), 49 Ariz. 19, 26 [63 P.2d 653, 108 A.L.R. 1156]; *Surtman* v. *Secretary of State* (1944), 309 Mich. 270 [15 N.W.2d 471, 474].)

The state, in the exercise of its police power, could constitutionally have required deposit of security by the owners of all vehicles as a condition to licensing them. (*Opinion of the Justices, In re* (1925), 81 N.H. 566 [129 A. 117, 39 A.L.R. 1023]; *Opinion of the Justices, In re* (1925), 251 Mass. 569 [147 N.E. 681]; *Brest* v. *Comissioner of Insurance* (1930), 270 Mass. 7 [169 N.E. 657]; *Ex parte Poresky* (1933), 290 U.S. 30 [54 S.Ct. 3, 78 L.Ed. 152].) Instead, the state chose to allow financially irresponsible licensed operators to drive until they became involved in an accident with the consequences described in sections 419 and 420 of the Vehicle Code and their financial irresponsibility was thus brought to the attention of the department, and then to require suspension of their licenses.

Suspension of the license without prior hearing but subject to subsequent judicial review did not violate due process if reasonably justified by a compelling public interest. (*Bourjois* v. *Chapman* (1937), 301 U.S. 183, 189 [57 S.Ct. 691, 81 L.Ed. 1027, 1032]; see also *Phillips* v. *Commissioner of Internal Rev.* (1931), 283 U.S. 589, 596-597 [51 S.Ct. 608, 75 L.Ed. 1289].) The compelling public interest here appears

from the obvious carelessness and financial irresponsibility of a substantial number of drivers and from the following allegations of the petition: There are 3,879,931 motor vehicles registered in California. During the first four months after the effective date of the law now under consideration, 19,808 persons were ordered by the department to establish that they were adequately insured or deposit security. More than 6,567 operators' licenses were suspended under the applicable law, and more than 1,300 "citations per month for suspension of license" were issued by the department. In these circumstances it is apparent that to require a hearing in every case before suspension of a license would have substantially burdened and delayed if not defeated the operation of the law. The requirement of due process was recognized and accepted by section 317 of the Vehicle Code, which declared that "Nothing in this code shall be deemed to prevent a review or other action as may be permitted by the Constitution and laws of this State by a court of competent jurisdiction with reference to any order of the department refusing, canceling, suspending or revoking a license." Such review can be had by application to the superior court for writ of mandate (Code Civ. Proc., §§ 1085, 1086). Also, an action for declaratory relief has been used in a comparable situation (*Ratliff* v. *Lampton* (1948), *supra*, 32 Cal.2d 226). General language concerning the requirement of a hearing in *Carroll* v. *California Horse Racing Bd.* (1940), 16 Cal.2d 164, 168 [105 P.2d 110]; *Ratliff* v. *Lampton* (1948), *supra*, p. 230 of 32 Cal.2d; and *People* v. *Noggle* (1935), 7 Cal.App.2d 14, 18 [45 P.2d 430], is not controlling here, for each of those cases concerned a statute which was construed to require opportunity to be heard before discretionary revocation of a license became effective.

### Delegation of Power

Giving to the Department of Motor Vehicles the power and duty to find the facts on which suspension of license depended, and to exercise limited "judgment," did not violate section 1 of article III or section 1 of article VI of the state Constitution (see *Suckow* v. *Alderson* (1920), 182 Cal. 247, 250 [187 P. 965]; *Dominguez Land Corp.* v. *Daugherty* (1925), 196 Cal. 453, 483 [238 P. 697, 44 A.L.R. 1]). Although the Legislature did not provide detailed directions as to the manner in which the department was to reach a "judgment" as to the amount of security required, it specified as a guide

the probable size of "any [court] judgment" which "may be recovered." (Veh. Code, § 420.) The facts and legal principles governing the recovery of judgments for damages are a matter of public knowledge and provide a reasonable, sufficiently certain standard to be followed by the department. (*Cf. Dominguez Land Corp.* v. *Daugherty* (1925), *supra*, pp. 485-486 of 196 Cal.; *Jersey Maid Milk Products Co.* v. *Brock* (1939), 13 Cal.2d 620, 652-657 [91 P.2d 577]; *Housing Authority* v. *Dockweiler* (1939), 14 Cal.2d 437, 461-462 [94 P.2d 794].)

### Culpability

The statute did not require security of every operator who might be involved in an accident, but only of those against whom, in the opinion of the department, a judgment might be recovered. Inasmuch as the recovery of a judgment depends, in theory at least, upon culpability, it would seem that the statute, presumptively properly administered, was not open to the objection that under it the nonculpable were subject to arbitrary discrimination.

### Financial Ability, Equal Protection

Financial responsibility laws such as this do not unconstitutionally discriminate against the poor. (See *Watson* v. *Division of Motor Vehicles* (1931), 212 Cal. 279, 284 [298 P. 481]; *Rosenblum* v. *Griffin* (1938), 89 N.H. 314, 319 [197 A. 701, 115 A.L.R. 1367].) Those damaged by the negligence of indigent drivers may be indigent also, and as little able as the drivers to bear the cost of such negligence. The fallacy of the argument that the law favored the rich over the poor "lies in the failure to distinguish between equality of opportunity and ability to take advantage of the opportunity which is offered to all. The equality of the Constitution is the equality of right, and not of enjoyment." (*Watson* v. *Division of Motor Vehicles* (1931), *supra*, p. 284 of 212 Cal.) Those who cannot afford to possess automobiles are as little able to enjoy the opportunity of driving on the public highways as those who cannot afford insurance or security.

Objection is made by petitioner that suspending his license after the accident did not make him more financially responsible; indeed, in his case, suspending his license made him less financially responsible, for it deprived him of his means of livelihood for himself, his wife and nine children. This contention constitutes no more than an argument that the Legis-

lature acted unwisely in selecting a financial responsibility law of a lock-the-barn-door-after-the-horse-is-stolen type instead of a compulsory preinsurance law or some other method of treating the problem (see 1 Stanf.L.Rev. 263). Our concern, however, is with the validity of the law under attack and not with whether a better law could be devised. (See *Watson* v. *Division of Motor Vehicles* (1931), *supra*, pp. 285-286 of 212 Cal.)

### Self-Insurers

■ The provisions permitting persons in whose names more than 25 motor vehicles were registered to qualify as self-insurers (Veh. Code, § 420, subd. (b), par. (4), § 420.7) did not create an arbitrary discrimination. Inasmuch as the provisions were patently based upon the probable financial ability of such persons to respond in damages, the classification was one which the Legislature could reasonably make.

For the reasons above stated, the alternative writ of mandate heretofore issued is discharged, and the petition for the peremptory writ is denied.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

CARTER, J, Dissenting.—On the main issue, the majority hold (citing as authority *Bourjois* v. *Chapman*, 301 U.S. 183 [57 S.Ct. 691, 81 L.Ed. 1027]; *Phillips* v. *Commissioner of Internal Rev.*, 283 U.S. 589 [51 S.Ct. 608, 75 L.Ed. 1289]) that due process of law requiring notice and hearing is satisfied because a court review may be had after the suspension of a license without a hearing by the department. In the Bourjois case a Maine statute authorized the public official to issue permits for the sale of cosmetics and refuse such permits where they ". . . contain injurious substances in such amounts as to be poisonous, injurious or detrimental to the person." The court states: "And neither constitution requires that there must be a hearing of the applicant before the board may exercise a judgment under the circumstances and of the character here involved. The requirement of due process of law is amply safeguarded by sec. 2 of the statute, which provides: 'From the refusal of said department to issue a certificate of registration for any cosmetic preparation appeal shall lie to the superior court in the county of Kennebec or any other county in the state from which the same was offered for registration.'"

In the Phillips case the issue involved was the payment of taxes, and was based on the principle that: "Property rights must yield provisionally to governmental need. . . . The underlying principle in that case was not such relation, but the need of the government promptly to secure its revenues." In the instant case it is said that the rule that a hearing in court after the suspension is sufficient to satisfy due process, is limited to cases where there is a "compelling public interest," and such interest in this case is: ". . . the *obvious carelessness* and financial irresponsibility of a substantial number of drivers and from the following allegations of the petition: There are 3,879,931 motor vehicles registered in California. During the first four months after the effective date of the law now under consideration, 19,808 persons were ordered by the department to establish that they were adequately insured or deposit security. More than 6,567 operators' licenses were suspended under the applicable law, and more than 1,300 'citations per month for suspension of license' were issued by the department. In these circumstances it is apparent that to require a hearing in every case before suspension of a license would have substantially burdened and delayed if not defeated the operation of the law." (Emphasis added.)

Assuming that the above rule stated by the majority is sound, there is no "compelling public interest" here. In *Bourjois* v. *Chapman, supra,* the vital interest was the necessity for immediate protection of the public health. In *Phillips* v. *Commissioner, supra,* it was the immediate necessity that the *government receive its tax revenue in order to function.* We have no comparable pressing need in the instant case. There is no issue of immediate danger to the public health involved nor is there any question of indispensable government revenue. *The sole need is that a private person shall have security for the payment of any damages caused to him by another individual.* Certainly that presents no urgency for immediate action which will justify depriving a person of the use of his automobile, his sole means of livelihood. The majority opinion states, as seen from the above quotation, that obviously careless persons' licenses were suspended for failure to post security. That is a *non sequitur.* It does not follow from the failure to post security that the drivers were careless. Nor does it follow from the fact that they were in accidents that they were careless drivers. They may have been wholly blameless. But even more important, there is no

connection between careless drivers and posting of security, that is, the statute is not designed to keep seemingly careless drivers off the highways. *That is true because they are permitted to drive, careless or not, if they post security.* Hence the purpose of the statute is only security for payment of damages to the innocent person.

The recent U.S. Supreme Court case of *Ewing* v. *Mytinger & Cosselberry, Inc.,* 339 U.S. 594 [70 S.Ct. 870, 94 L.Ed. ——], involved a statute authorizing the administrator to determine whether probable cause existed for the seizure of goods on the basis that they were falsely labelled. That determination did not result in an immediate seizure. Such could only be accomplished if the attorney general, in his discretion, brought an action to seize and confiscate the goods. Only upon the commencement of such an action could the goods be seized pending the court proceeding. The court stated: "We have repeatedly held that no hearing at the preliminary stage is required by due process so long as the requisite hearing is held *before the final administrative order becomes effective.* (Emphasis added) . . . But this case does not go as far. Here an administrative agency is merely determining whether a judicial proceeding should be instituted. Moreover, its finding of probable cause, while a necessary prerequisite to multiple seizures, has no effect in and of itself. All proceedings for the enforcement of the Act or to restrain violations of it must be brought by and in the name of the United States, sec. 307. Whether a suit will be instituted depends on the Attorney General, not on the administrative agency. He may or may not accept the agency's recommendation. If he does, seizures are made and libels are instituted. But the seizures and suits are dependent on the discretion of the Attorney General." In the instant case the person's license is suspended. Moreover, stress is laid upon the general public interest involved as distinguished from rights between individuals.

It should be noted that the United States Supreme Court has said since the Bourjois and Phillips cases: "The demands of *due process* do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding *so long as the requisite hearing is held before the final order becomes effective.*" (Emphasis added.) (*Opp Cotton Mills* v. *Administrator of W. & H. Div.,* 312 U.S. 126, 152 [61 S.Ct. 524, 86 L.Ed. 624].)

In the case at bar no hearing has ever been accorded petitioner. His operator's license has been suspended.

Since his right to operate an automobile on the public highway is essential to his livelihood, I am constrained to hold that he has been deprived of property without due process of law, and the statute here involved is unconstitutional.

I would therefore issue the peremptory writ prayed for.

EDMONDS, J.—In my opinion, if the Department of Motor Vehicles may, without a hearing, summarily suspend the license of a person to operate a motor vehicle, the provisions of the Vehicle Code purporting to give that authority violate constitutional guarantees. As the court here construes the statute, one may lose a valuable property right without the opportunity even to show that the reported accident did not occur or, if there was such an accident, he was not the driver of an automobile causing personal injury or property damage.

The Vehicle Code, as it read in 1948 when Escobedo's license was suspended, provided that the Motor Vehicle Department shall "... within 60 days after the receipt of a report of a motor vehicle accident within this State which has resulted in bodily injury or death or damage to the property of any one person in excess of one hundred dollars ($100), suspend the license of each operator . . . involved in such accident. . . ." (Veh. Code, § 420(a).) The causes for suspension, therefore, are (1) the licensee was the operator of the vehicle involved in the accident; (2) less than 60 days have elapsed since the accident report was received; and (3) bodily injury resulted or property was damaged to an amount in excess of $100.

The license may not be suspended if the operator deposits security "in a sum which shall be sufficient in the judgment of the department to satisfy any judgment or judgments for damages resulting from such accident as may be recovered against such operator or owner." (Veh. Code, § 420(a).) An operator who alone suffers damage or injury or one who was driving a vehicle which was "... stopped, standing, or parked, whether attended or unattended . . ." at the time of the accident, (unless he was doing so illegally or the vehicle lacked lighted lamps as required by law) does not have to meet this requirement. And suspension shall not be imposed upon one who has been released from liability, or has been finally adjudicated not liable, or has executed a confession of judgment or has executed an acknowledged agreement in

writing providing for the payment of the amount of the damages resulting from the accident (§ 420.1).

Self-insurers are exempted from certain requirements of the law and other conditions are exacted of them (§ 420.7). Under some circumstances the license of a self-insured operator may not be suspended.

By these provisions, the Legislature has directed the Department of Motor Vehicles to suspend the license of an operator under specified circumstances or for certain causes, but only if his conduct, either at the time of the accident or subsequently, does not bring him within one of the stated exemptions which bars that action. This constitutes statutory authority to suspend an operator's license for enumerated causes only. Certainly the law contemplates a determination that the operator against whom action is proposed to be taken is the person who was involved in the accident reported as having occurred.

The administrative agency must also find whether personal injury occurred or property was damaged in extent of $100; whether the security demanded in the alternative to suspension is "sufficient in the judgment of the department"; whether any other policy or bond held by the driver is ". . . in the judgment of the department . . ." sufficient; whether the vehicle was stopped, standing, or parked, and if so whether it was properly lighted; and finally, whether the operator is a self-insurer.

It is a well established principle that, under a statute providing for dismissal of an employee or revocation of a license "for cause," there must be notice and a hearing before such action may be taken. The rule has been applied to a teacher (*Keenan* v. *San Francisco Unified School Dist.*, 34 Cal.2d 708 [214 P.2d 382]); automobile operator (*Ratliff* v. *Lampton*, 32 Cal.2d 226 [195 P.2d 792, 10 A.L.R.2d 826]); liquor licensee (*Covert* v. *State Board of Equalization*, 29 Cal.2d 125 [173 P.2d 545]); horse trainer (*Carroll* v. *California Horse Racing Bd.*, 16 Cal.2d 164 [105 P.2d 110]); and civil servants generally (*La Prade* v. *Department of Water & Power*, 27 Cal.2d 47 [162 P.2d 13]; *Steen* v. *Board of Civil Service Commrs.*, 26 Cal.2d 716 [160 P.2d 816]). There is at least as much reason for requiring notice and hearing under a statute providing for deprivation of a license for any one of specifically enumerated causes as under legislation which allows such action "for cause" generally. Where the Legislature has

enumerated the causes or conditions for which a license may be suspended, the requirement of notice and a hearing to determine the existence of those causes will be implied. Section 420(a) should be construed accordingly.

Moreover, section 420(a), under which Escobedo's license was suspended, should be read in conjunction with section 314, which is the general provision governing the suspension and revocation of an operator's license. The latter section provides for suspension or revocation of a license where, among other things, ". . . the licensee has been involved as a driver in any accident causing death or personal injury or serious damage to property . . . [or where] . . . the safety of . . . persons upon the highway requires such action. . . ."

Section 314 embodies express provision for notice and hearing, in that it requires an "investigation" and "reexamination of the licensee . . . [upon] . . . 10 days' written notice of the time and place thereof . . ." and also provides for modification of any probation ". . . whenever good cause appears therefor." In *Ratliff* v. *Lampton, supra,* this court held that section 314 as then worded required ". . . an investigation and hearing conducted by the department which would afford the licensee an opportunity to present evidence under the rule in the Carroll and Steen cases." At the time of the Ratliff decision, section 314 provided for a determination after investigation "that good cause exists" for suspension. The causes enumerated by the statute then, as now, included the determination that the licensee was ". . . involved as a driver in any accident causing death or personal injury or serious damage to property" and the rule of the Ratliff case in this regard remains unchanged. In fact, subsequent amendment providing for "reexamination" and "written notice" makes it all the more evident that the Legislature intended to continue in effect this court's construction of that section.

Cases such as *Surtman* v. *Secretary of State,* 309 Mich. 270 [15 N.W.2d 471]; *Nulter* v. *State Road Commission,* 119 W.Va. 312 [193 S.E. 549, 194 S.E. 270]; *LaPlante* v. *State Board of Public Roads,* 47 R. I. 258 [131 A. 641]; and *Sullins* v. *Butler,* 175 Tenn. 468 [135 S.W.2d 930], which hold that the operation of a motor vehicle upon a public highway is "merely a personal privilege, and is not a property right," either concerned that right in connection with the use of a pleasure vehicle or failed to recognize the evolution of modern transportation. Today the social and economic circumstances

of many persons have placed a motor vehicle in the category of a necessity.

Escobedo's situation is a typical example of one in which the statute as now applied sweeps away established rights without opportunity for any defense of them. He is a gardener living at San Gabriel. By taking care of lawns and gardens there and in Pasadena, he supports himself, his wife and nine children. While driving his automobile from one place of his work to another, his vehicle collided with another one. The state can and does prescribe the qualifications which one must have to obtain a license allowing him to operate a motor vehicle. Failure to meet those requirements justifies denial of the license. But after it has been issued and one is relying upon it as a means of livelihood, a license to operate a motor vehicle attains the status of a property right. The suspension or revocation of such a license must meet the same requirements of procedural due process which have been applied in connection with a license to practice a profession.

The Motor Vehicle Department makes no claim that Escobedo was given a hearing. In an order of the department served upon him, he was told: "Since you have failed to otherwise meet the security requirements of section 420 of the Vehicle Code, you must now deposit security or have your driving privilege suspended." Such suspension was made effective 15 days after the date of the demand unless, in the meantime, security in the amount of $2,800 was deposited with the department. The attorney general does not contend that the department has made any determination of the respective liabilities of the operators of the two cars nor of the amount of damage caused by the crash. As far as the record shows, the order of suspension is based entirely upon the statements made in an "accident report" filed in one of its offices.

This is far from procedural due process. As succinctly stated in the Ratliff case, "It is contrary to commonly accepted principles of justice to revoke a license for cause without giving the person charged an opportunity to be heard before a decision is made, since the determination necessarily requires a fair consideration of any evidence offered by the licensee."

"Subsequent judicial review" of the department's action is no adequate substitute for a hearing in which the licensee would have an opportunity to present evidence tending to prove that he was not subject to the drastic sanction prescribed by the statute. This inadequacy is graphically illustrated by

the present record. Escobedo was summarily ordered to surrender his license in September, 1948. When he declined to do so, he was advised that the authorities intended to arrest and prosecute him for having a revoked license in his possession. On January 18, 1949, he filed in this court his petition for writ of mandate. During the 20 months which have since elapsed, presumably he has been unable to carry on his work.

For these reasons, I would grant the writ of mandate.