## IN RE PETITION OF CLAUDIA REUTZEL v. STATE, DEPARTMENT OF HIGHWAYS.

186 N. W. (2d) 521.

April 9, 1971—No. 42558.

*Warren Spannaus,* Attorney General, *James M. Kelley,* Assistant Attorney General, and *John R. Murphy,* Special Assistant Attorney General, for appellant.

*Dale E. Parker* and *Weis & Frauenshuh Law Firm,* for respondent.

PETERSON, JUSTICE.

The issue for decision, important to the administration of the license suspension provisions of the Safety Responsibility Act, is whether as a matter of either constitutional imperative or statutory intent, the commissioner of public safety must afford an accident-involved, uninsured motorist a hearing, with notice, prior to the commissioner's determination of the amount of security necessary to satisfy any judgment that might thereafter be entered against the motorist.

The Safety Responsibility Act (L. 1945, c. 285, codified as Minn. St. c. 170), as disclosed in its title, was enacted "for the promotion of safety of travel, minimizing of accidents on public highways and * * * the giving of proof of financial responsibility and security by owners and drivers of motor vehicles." The statutory scheme may be briefly summarized. Within 90 days after receiving a report of a motor vehicle accident resulting in bodily injury or death, or property damage in excess of $100,[1]

---

[1] The making of written accident reports is required by Minn. St. 169.09. Subd. 7 provides: "The driver of a vehicle involved in an accident

the commissioner must suspend the license of each driver and owner of each vehicle involved in such accident unless such driver or owner deposits security "in a sum which shall be sufficient in the judgment of the commissioner to satisfy any judgment or judgments for damages resulting from such accident as may be recovered against such driver or owner; provided notice of such suspension shall be sent by the commissioner to such driver and owner not less than ten days prior to the effective date of such suspension[2] and shall state the amount required as security." § 170.25, subd. 1. A security deposit is not required if, among other exceptions, the driver or owner was covered at the time of the accident by automobile liability insurance or bond in minimum amounts fixed by statute (§ 170.25, subds. 2 and 3; § 170.21, subd. 10) ; nor is a security deposit required if the accident caused no injury or damage or if "it appears to the satisfaction of the commissioner that the driver or owner is not liable for any damages resulting from the accident." § 170.26(1, 4). The security deposit ordered by the commissioner may not exceed the statutory amounts of required insurance and "[t]he com-

resulting in injury to or death of any person or total property damage to an apparent extent of $100 or more, shall promptly forward a written report of the accident to the commissioner [of public safety]." Subd. 9 provides that the department shall prepare forms for accident reports, calling for sufficiently detailed information to disclose existing conditions, causes, and the persons and vehicles involved; and subd. 10 requires that accident reports shall be made on those forms and contain all of the available information required by the form. Subd. 13 makes these accident reports and supplemental reports confidential. Although there are some stated exceptions in this provision, the parties' versions of the accident are not among them.

[2] Minn. St. 171.20, subd. 1, provides that the commissioner, upon suspending or revoking a license, shall require that all license certificates issued to the licensee shall be surrendered to and be retained by the department. Minn. St. 171.22(4) makes it an unlawful act to fail or refuse to surrender to the department, upon its lawful demand, any driver's license which has been suspended, revoked, or canceled.

missioner may reduce or increase the amount of security ordered in any case if, in his judgment, the amount ordered is excessive or inadequate." § 170.29.[3] The critical provisions governing the administrative determination and judicial review of that determination are contained in § 170.22:

"Subdivision 1. The commissioner shall have the powers and perform the duties imposed upon him by this chapter and may make rules and regulations necessary therefor and shall provide for hearings upon request of any person aggrieved by his final orders under this chapter.

"Subd. 2. Any person aggrieved by a final order of the commissioner under this chapter may review such order by certiorari in Ramsey county or the county of such person's residence in the manner provided by law. The issuance of a writ of certiorari shall not suspend the order of the commissioner unless a stay thereof shall be allowed by the court pending final determination of the matter."

The statutory and constitutional issues are put in sharp focus by this record. On June 17, 1969, petitioner, Claudia Reutzel, an uninsured motorist, drove her automobile into the rear end of an automobile owned and driven by one Bernard J. Harvanko, which was stopped at an arterial street in St. Cloud, Minnesota. Each driver shortly thereafter, in June, submitted a written report of the accident to the commissioner upon the prescribed departmental form. Reutzel, by check-marked answer to the form's questions as to "apparent contributing factors," asserted that Harvanko was improperly stopped but admitted that she

[3] A suspension of license for failure to make a security deposit is released whenever the required deposit is thereafter made; if evidence is filed with the commissioner that the depositor has been released from liability or finally adjudicated as not liable; or if after 13 months from the date of the accident no notice has been filed with the commissioner by any claimant that an action has been commenced by any party within 1 year from the date of the accident. § 170.27.

had been too closely following his lead automobile. Harvanko did not answer these questions.[4]

Information as to automobile damage and personal injury to either driver was called for by form questions in the accident report. Although this information was not supplied in the original report of either driver, it was submitted at later times. Sometime before August 19, 1969, it was apparently disclosed that Harvanko had incurred expense for the repair of his automobile in the amount of $125, and on that date the commissioner ordered petitioner to make a security deposit in that sum. She promptly complied within the time stated by the commissioner, and her driver's license was accordingly not suspended.

Thereafter, however, information was submitted to the commissioner that Harvanko had sustained personal injury for which he received medical treatment. On September 8 Harvanko and his physician completed a supplemental form supplied by the commissioner disclosing the physician's diagnosis of his injuries and declaring that his "estimated medical expense" (for physician's fees and drugs) was $300. And, in a space for the physician's statement of "other required expenses," the physician noted lost earnings in the amount of $5,310 (because of physical inability to perform his occupation as a salesman). Although the form apparently was signed by Harvanko's attorney, rather than his physician, it appears that the medical information, as such, conformed to a written medical report of the physician to the attorney.

The commissioner thereupon notified petitioner that the required security deposit was increased to $5,725 and that she must make the deposit within 15 days thereafter to avoid suspension of her license. She was unable to make the additional de-

---

[4] It is apparent that both drivers completed another section of the form which provided space for the drivers' narrative descriptions of the accident, but these accounts were excised from the reports as presented to the district court.

posit and accordingly surrendered her driver's license on September 27, 1969.

The issue concerning the propriety of the commissioner's order was raised for the first time after petitioner's license was surrendered. Initially, by a letter from her attorney to the commissioner on September 12, she protested the prospective suspension and asked as to the availability of a limited driver's license. Her attorney, in that letter, asserted that the accident resulted in no damage to the Reutzel automobile and inconsequential damage to the Harvanko automobile, and he asserted that Harvanko, at the time of the accident, had said he was not injured. The license suspension, as stated in the letter, resulted in hardship to petitioner in the pursuit of her employment.[5] The commissioner's response does not appear but his order was not modified. The issue was then raised for judicial determination by a petition for a writ of certiorari from the district court to review the final order of the commissioner pursuant to Minn. St. 170.22, subd. 2.[6] Petitioner did not request a stay of the proceedings as authorized by the statute.

The sole issue submitted to the district court was whether the statute, if it authorized suspension of Reutzel's driver's license by the commissioner without prior hearing and based only upon the written reports submitted to him, deprived her of procedural due process. The trial court, ruling that the suspension provisions of the Safety Responsibility Act were unconstitutional on

---

[5] Mrs. Reutzel, a widow, age 59, lives in a farm home at Belgrade, Minnesota, and is employed as a counsellor by the State Home School for Girls, Sauk Centre. She customarily commuted by automobile. Although she has arranged alternative transportation, she must walk a mile and a half from her home to the county road point of pick-up.

[6] The petition was actually made under § 171.19, seeking an adversary hearing in which petitioner and Harvanko would be required to give evidence and the commissioner would be required "to justify" the suspension of her license. This was, by agreement of the parties, instead treated as if instituted under § 170.22. No evidence was taken, and the decision was based on the administrative record of the commissioner.

that ground, ordered that petitioner's driver's license be returned to her forthwith. The state appeals from that order.

■ Our Safety Responsibility Act, as expanded in 1945,[7] is the Minnesota Legislature's response to what it deemed a compelling public necessity of promoting highway safety and, more directly, financial responsibility for injury, death, or property damage resulting from the use of motor vehicles. This necessity has been authoritatively acknowledged. "The use of the public highways by motor vehicles, with its consequent dangers," Mr. Justice Roberts wrote in Reitz v. Mealey, 314 U. S. 33, 36, 62 S. Ct. 24, 26, 86 L. ed. 21, 24, "renders the reasonableness and necessity of regulation apparent" and "[a]ny appropriate means adopted by the states to insure competence and care on the part of [licensed drivers] and to protect others using the highway is consonant with due process." The police power exerted for such purpose, as Mr. Justice Frankfurter subsequently wrote in Kesler v. Dept. of Public Safety, 369 U. S. 153, 172, 82 S. Ct. 807, 819, 7 L. ed. (2d) 641, 654, "is as pervasive as any of the reserved powers of the States"; and, accordingly, as Mr. Chief Justice Warren added (369 U. S. 179, 82 S. Ct. 822, 7 L. ed. [2d] 658), "wide latitude should be allowed in the formulation of such laws."

A state statute which supplemented its financial responsibility law with a requirement that all insurance companies make insurance available to driver licensees (with some exceptions) through a system of assigned risks was sustained against due-process challenge in California State Auto. Assn. v. Maloney, 341 U. S. 105, 71 S. Ct. 601, 95 L. ed. 788, in which Mr. Justice

---

[7] A predecessor statute (L. 1927, c. 412, § 61, subd. b) was more limited in scope, providing that a court could forbid driving by persons convicted of violating traffic laws unless they furnished indemnity bonds. See, Kesler v. Dept. of Public Safety, 369 U. S. 153, 159, 82 S. Ct. 807, 812, 7 L. ed. (2d) 641, 647, for a brief history of early forms of safety responsibility legislation among the several states.

Douglas made this concluding observation (341 U. S. 110, 71 S. Ct. 604, 95 L. ed. 793) :

"* * * Highway accidents with their train of property and personal injuries are notoriously important problems in every community. Clearing the highways of irresponsible drivers, devising ways and means for making sure that compensation is awarded the innocent victims, and yet managing a scheme which leaves the highways open for the livelihood of the deserving are problems that have taxed the ingenuity of law makers and administrators."

All states have some form of safety responsibility laws. A most direct form, notably in Massachusetts, is a form of compulsory automobile liability insurance requiring as a condition of registration the prior posting of cash or bond in specified amount or the procurement of liability insurance in like amount. These laws have without exception survived constitutional challenge.[8] Many states, including Minnesota, have adopted the less direct form of conditioning continued license to drive a motor vehicle upon proof of financial responsibility only after the occurrence of a damage-producing accident involving a motor vehicle owned or operated by a licensee.[9] These laws, with one clear exception,[10]

---

[8] See, In re Opinion of Justices, 251 Mass. 617, 147 N. E. 680, and Ex Parte Poresky, 290 U. S. 30, 54 S. Ct. 3, 78 L. ed. 152. See, also, In re Opinion of Justices, 81 N. H. 567, 129 A. 117.

[9] The effect of this less stringent form of financial responsibility has been to promote procurement of insurance coverage by more drivers. Prior to the enactment of our statute, no more than 45 percent of motor vehicles were "adequately" insured, but since its enactment the numbers have increased to over 90 percent. See, Lystad, *The Functioning of the Minnesota Safety Responsibility Law,* 1954 Ins. L. J. 746.

[10] People v. Nothaus, 147 Colo. 210, 363 P. (2d) 180. In Schecter v. Killingsworth, 93 Ariz. 273, 380 P. (2d) 136, the issue was avoided by statutory construction requiring presuspension hearing. Cf. Farmer v. Killingsworth, 102 Ariz. 44, 424 P. (2d) 172.

have likewise been sustained against the due-process challenge raised in the instant case.[11]

Escobedo v. State Dept. of Motor Vehicles, 35 Cal. (2d) 870, 222 P. (2d) 1, and Gillaspie v. Dept. of Public Safety, 152 Tex. 459, 259 S. W. (2d) 177, certiorari denied, 347 U. S. 933, 74 S. Ct. 625, 98 L. ed. 1084, are leading cases sustaining the constitutionality of statutes like our own. In Escobedo the conflicting concerns of the driver and the state were carefully considered. The uninsured driver's most pressing concern was need for his automobile in the performance of his occupation as a gardener, from which he earned a livelihood for himself and his large family; and his modest means rendered him financially unable to make a security deposit of $2,800. The administrative burden upon the state was the volume of such suspensions, some 1,300 per month,[12] the processing of which by presuspension

[11] Gillaspie v. Dept. of Public Safety, 152 Tex. 459, 259 S. W. (2d) 177, certiorari denied, 347 U. S. 933, 74 S. Ct. 625, 98 L. ed. 1084; Williams v. Newton (Fla.) 236 So. (2d) 98; Larson v. Warren (Fla.) 132 So. (2d) 177, appeal dismissed, 369 U. S. 427, 82 S. Ct. 879, 8 L. ed. (2d) 7; Franklin v. Scurlock, 224 Ark. 168, 272 S. W. (2d) 62; Orr v. Superior Court, 71 Cal. (2d) 220, 77 Cal. Rptr. 816, 454 P. (2d) 712; Escobedo v. State Dept. of Motor Vehicles, 35 Cal. (2d) 870, 222 P. (2d) 1; Adams v. City of Pocatello, 91 Idaho 99, 416 P. (2d) 46; Doyle v. Kahl, 242 Iowa 153, 46 N. W. (2d) 52; State v. Finley, 198 Kan. 585, 426 P. (2d) 251; Ballow v. Reeves (Ky. App.) 238 S. W. (2d) 141; Sharp v. Dept. of Public Safety (La. App.) 114 So. (2d) 121; Hadden v. Aitken, 156 Neb. 215, 55 N. W. (2d) 620, 35 A. L. R. (2d) 1003; Commonwealth v. Koczwara, 78 Pa. D. & C. 6; Berberian v. Lussier, 87 R. I. 226, 139 A. (2d) 869; State v. Stehlek, 262 Wis. 642, 56 N. W. (2d) 514; Thornley v. Wyoming Highway Dept. (Wyo.) 478 P. (2d) 600. See, also, Latham v. Tynan (2 Cir.) 435 F. (2d) 1248; Trujillo v. DeBaca (D. N. Mex.) 320 F. Supp. 1038.

[12] At the district court hearing in the instant case, the attorney general stated that the commissioner of public safety makes orders in excess of 50,000 suspensions annually, of which 40,000 are suspensions pursuant to the Safety Responsibility Act. Like figures were noted in Anderson v. Commr. of Highways, 267 Minn. 308, 313, note 4, 126 N. W. (2d) 778, 781.

hearings "would have substantially burdened and delayed if not defeated the operation of the law." (35 Cal. [2d] 877, 222 P. [2d] 6.) The "compelling public interest" against which these competing concerns were measured was "the obvious carelessness and financial irresponsibility of a substantial number of drivers." The Escobedo court concluded (35 Cal. [2d] 876, 222 P. [2d] 5):

"The state, in the exercise of its police power, could constitutionally have required deposit of security by the owners of all vehicles as a condition to licensing them. [Cases cited.] Instead, the state chose to allow financially irresponsible licensed operators to drive until they became involved in an accident with the consequences described [in the Safety Responsibility Act] and their financial irresponsibility was thus brought to the attention of the department, and then to require suspension of their licenses.

"Suspension of the license without prior hearing but subject to subsequent judicial review did not violate due process if reasonably justified by a compelling public interest. [Cases cited.]"

In Gillaspie the Texas court underscored the public necessity for prompt action, and, upon that premise, concluded (152 Tex. 468, 259 S. W. [2d] 183):

"There is no denial of due process in the Department's fixing the amount of security and ordering suspension of [the] driver's license and [the owner's] registration certificate prior to a hearing. The Act does not require hearing before suspension, although it is provided in Section 2(a) that the Department shall provide for hearings upon request of persons aggrieved by its orders or acts. It is not shown by the record that petitioners requested a hearing. Since the driver's license and the registration represent privileges and not property rights, regulation of them, their issuance, suspension or cancellation may be committed to an administrative body or agency. And it is generally held that suspension of license prior to hearing but subject to judicial

review does not violate due process. [Cases cited.] Due process and protection against abuse of administrative authority are further assured when the statute provides that the complaining party may have a stay until final decision. Porter v. Investors Syndicate, 286 U. S. 461, 52 Sup. Ct. 617, 76 L. Ed. 1226, 1232."

Perez v. Tynan (D. Conn.) 307 F. Supp. 1235, represented a Federal court response to the same issue. The court, considering the constitutionality of the Connecticut Motor Vehicle Financial Responsibility Act, held that it denied neither substantive nor procedural due process. Unlike the instant case, the amount of the security ordered was not claimed to be excessive, but the driver denied fault or liability. Although acknowledging that a driver's license and motor vehicle registration, whether characterized as a privilege or a right, are entitled to protection of the Fourteenth Amendment of the United States Constitution and that an opportunity to be heard before deprivation of a right or privilege is not lightly to be disregarded, the court held that the ordering of security deposit without a prior determination of fault raised no substantial Federal constitutional question.

The constitutional issue has been to some extent answered by our own decision in Anderson v. Commr. of Highways, 267 Minn. 308, 126 N. W. (2d) 778. The issue there arose in connection with the commissioner's power, under § 171.18, to suspend the license of "a habitual violator of the traffic laws" and to do so "without preliminary hearing upon a showing by department records or other sufficient evidence." We said (267 Minn. 317, 126 N. W. [2d] 784):

"* * * While the privilege [to operate a motor vehicle upon the public highways] is a valuable one, and may not be unreasonably or arbitrarily taken away [citing State v. Moseng, 254 Minn. 263, 95 N. W. (2d) 6], its enjoyment depends upon compliance with conditions prescribed by law and is always subject to such regulation and control as public authority may see fit to impose under the police power in the interest of public safety and welfare. * * *

. "Nor can we agree with petitioner that he has been denied a proper hearing. Petitioner was provided a hearing before a representative of the Highway Department on May 14, 1962. The matter was later reviewed by proceedings in district court. A hearing need not take place before the administrative decision is made, provisions for appeal to the district court being all that is required."

■ Notwithstanding the overwhelming weight of authority sustaining the procedural provisions of safety responsibility acts, three recent decisions of the United States Supreme Court, although involving different statutes, have revived the issue: Sniadich v. Family Finance Corp. 395 U. S. 337, 89 S. Ct. 1820, 23 L. ed. (2d) 349;[13] Goldberg v. Kelly, 397 U. S. 254, 90 S. Ct. 1011, 25 L. ed. (2d) 287; and Wisconsin v. Constantineau, 400 U. S. 433, 91 S. Ct. 507, 27 L. ed. (2d) 515. Sniadich held that a prejudgment garnishment proceeding by a creditor freezing wages of a debtor pending trial, without prior notice and hearing, violated fundamental principles of due process. Goldberg held that, before discontinuance of public assistance payments to a welfare recipient, the administrative official who determines continued eligibility is required, as essential due process, to afford the recipient a pretermination evidentiary hearing, at which the recipient could appear personally (with or without counsel) to present evidence orally and to confront or cross-examine adverse witnesses. Constantineau held unconstitutional a statute which authorized the "posting," without notice or hearing of a notice forbidding anyone to furnish intoxicating liquor to any person who "by excessive drinking" produces certain conditions or exhibits certain traits, such as exposing himself or his family "to want" or becoming "dangerous to the peace" of the community.

---

[13] See, also, Jones Press v. Motor Travel Service, 286 Minn. 205, 176 N. W. (2d) 87, applying and in a measure extending Sniadich v. Family Finance Corp. 395 U. S. 337, 89 S. Ct. 1820, 23 L. ed. (2d) 349.

Sniadich, in our view, is a distinguishable situation since, unlike the public purpose of safety responsibility statutes, the garnishment procedure there challenged relates only to the creditor-debtor relationship of private citizens. Safety responsibility statutes, to be sure, indirectly involve a creditor's interest to the extent that the suspension of a license is released with the consent of the other driver or upon satisfaction of his postaccident judgment for damages. We do not read Sniadich as overruling Reitz v. Mealey, *supra*, and Kesler v. Dept. of Public Safety, *supra*, or otherwise depreciating a potential creditor's interest in enforcement of the Safety Responsibility Act. Sniadich rests heavily on the distinguishable proposition that wages are "a specialized type of property presenting distinctive problems in our economic system" and that a prejudgment garnishment taking of wages "may impose tremendous hardship on wage earners with families to support." Mr. Justice Douglas (who wrote the opinion in California State Auto. Assn. v. Maloney, *supra*) wrote in Sniadich (395 U. S. 342, 89 S. Ct. 1823, 23 L. ed. [2d] 354) :

"* * * Where the taking of one's property is so obvious, it needs no extended argument to conclude that absent notice and a prior hearing * * * this prejudgment garnishment procedure violates the fundamental principles of due process."

Goldberg is more in point to the extent that it involves a citizen-state conflict of interest, and it is important in relation to the probable scope of any required administrative hearing. Welfare regulations in New York required that a welfare caseworker, who questions a recipient's continued eligibility for public assistance payments must first discuss the matter with the recipient. If the caseworker's recommendation for termination of aid is concurred in by his supervisor, the recipient is sent a notice at least 7 days prior to the effective date of termination, stating the reasons for the proposed discontinuance or suspension and advising the recipient that he may have the proposal reviewed by yet another superior welfare official, at which time the recip-

ient might submit, for purposes of review, a written statement to demonstrate why payments should not be discontinued or suspended. Where the reviewing official finally decides upon discontinuance or suspension, a decision which must be made expeditiously, a further notice must be given the recipient stating the proposed effective date and informing the recipient that he may request a post-termination fair hearing before a state hearing officer. The result of this hearing, with a record made of the testimony of witnesses, is subject to judicial review. Mr. Justice Brennan, writing for the majority, said that this procedure was constitutionally deficient (397 U. S. 260, 90 S. Ct. 1016, 25 L. ed. [2d] 295):

"* * * The District Court held that only a pre-termination evidentiary hearing would satisfy the constitutional command, and rejected the argument of the state and city officials that the combination of the post-termination 'fair hearing' with the informal pre-termination review disposed of all due process claims. The court said: 'While post-termination review is relevant, there is one overpowering fact which controls here. By hypothesis, a welfare recipient is destitute, without funds or assets. * * * Suffice it to say that to cut off a welfare recipient in the face of * * * "brutal need" without a prior hearing of some sort is unconscionable, unless overwhelming considerations justify it.' Kelly v. Wyman, 294 F. Supp. 893, 899, 900 (1968). The court rejected the argument that the need to protect the public's tax revenues supplied the requisite 'overwhelming consideration.' 'Against the justified desire to protect public funds must be weighed the individual's overpowering need in this unique situation not to be wrongfully deprived of assistance * * *.'

"* * * The constitutional challenge cannot be answered by an argument that public assistance benefits are 'a "privilege" and not a "right." ' * * * The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,'

Joint Anti-Fascist Refugee Committee v. McGrath, 341 U. S. 123, 168 [71 S. Ct. 624, 647, 95 L. ed. 817, 852] (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. * * *

"* * * Thus the crucial factor in this context * * * is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy.

"Moreover, important governmental interests are promoted by affording recipients a pre-termination evidentiary hearing. * * * The same governmental interests which counsel the provision of welfare, counsel as well its uninterrupted provision to those eligible to receive it; pre-termination evidentiary hearings are indispensable to that end."

We think, nevertheless, that suspension of a license stands on a different footing. It is an inconvenience, in some situations a serious one, but it is an inconvenience within the power of the licensee to avoid by preaccident purchase of insurance, a normal expense of operating a motor vehicle. It is in distinct contrast to the withholding of the basic necessities of life from impoverished welfare recipients whose poverty may not be a matter of choice or control. Termination of public assistance payments involves no greater public interest than the conservation of public money which, important as it is, does not approach the magnitude of the state's pervasive interest in personal protection of all the citizens who use the public highways. Kesler v. Dept. of Public Safety, *supra.* Trujillo v. DeBaca (D. N. Mex.) 320 F. Supp. 1038, a 3-judge Federal district court decision subsequent

to Sniadich and Goldberg, makes a like distinction in upholding the New Mexico Safety Responsibility Act.

Constantineau adds little to Sniadich and Goldberg. It is of some significance that Constantineau cites the former but not the latter, seemingly underscoring a distinction between the private and public interest involved. We find even more significant, in relation to safety responsibility legislation spanning more than 40 years, this threshold observation of Mr. Justice Douglas (400 U. S. 436, 91 S. Ct. 510, 27 L. ed. [2d] 518):

"* * * Generalizations are hazardous as some state and federal administrative procedures are summary by reason of necessity or history."

We therefore join the host of state courts which have held that absence of statutory provision for presuspension hearing does not deprive petitioner, an uninsured motorist, of constitutional due process. The sum of these authorities should not be summarily swept aside merely on the basis of decisions involving substantially different statutory subjects with significantly different police-power purposes.

■ The constitutional issue cannot reasonably be avoided, moreover, by an expanded statutory interpretation. Although that was done in Schecter v. Killingsworth, 93 Ariz. 273, 380 P. (2d) 136, it was accomplished only because of an ambiguous provision of the Arizona Safety Responsibility Act, dissimilar from § 170.22. The statute, as the Arizona court concluded (93 Ariz. 282, 380 P. [2d] 142), impliedly intended that, "when requested, an aggrieved person shall have an administrative hearing before the suspension order becomes effective" and "that the request for a hearing was intended to toll the effective date of the suspension order" pending "a *trial de novo* to determine whether the order or act is lawful and reasonable." We hold that § 170.22 is unambiguous and that, considering the statutory and

constitutional precedent existing at the time of its exactment,[14] it cannot credibly be now otherwise interpreted.[15]

We do, however, construe our statute to require that the commissioner must make his administrative determination upon evidence of more substantial character than that presented to the commissioner in fixing the security deposit required of this petitioner. Although petitioner's own accident report clearly indicated the possibility of a judgment against her, nothing in her report indicated the possibility of a judgment in the amount determined by the commissioner. The supplementary report on behalf of Harvanko was but a bare assertion of damages in that amount. His attorney's transmittal letter stated that Harvanko had lost earnings in the amount of $5,300; his physician's report listed it as "other medical expense." Although the statute does not contemplate the making of the commissioner's determination upon a quantity or quality of evidence necessary to sanction a final adjudication in litigation between the accident-involved motorists, the legislature could not have contemplated such determination without at least a minimum showing from Harvanko himself,[16] preferably in a sworn statement, that he was regularly employed in a stated occupation, with stated earnings, and that

[14] Cf. Ingebritson v. Tjernlund Mfg. Co. 289 Minn. 232, 183 N. W. (2d) 552.

[15] If it were held that due process required a presuspension hearing, under the mandate of Goldberg v. Kelly, 397 U. S. 254, 90 S. Ct. 1011, 25 L. ed. (2d) 287, it is doubtful that even the Arizona act, as stated in Schecter v. Killingsworth, 93 Ariz. 273, 380 P. (2d) 136, and amplified in Burri v. Campbell, 102 Ariz. 541, 543, 434 P. (2d) 627, 629, would pass the Goldberg test of constitutional due process.

[16] We do not mean that a report by an attorney for the injured driver would be in all circumstances incompetent, as where it clearly is evidence obtained from a competent source; it may be presumed, as provided in the Code of Professional Responsibility, DR1-102A, that a lawyer will not make a fraudulent report. We do mean that it must be something more than an ad damnum clause in a civil complaint for damages.

he was unable to perform that occupation because of the accident-produced injury, as attested by a physician. The presentation of such evidence will impose no greater administrative burden or delay than is involved in the commissioner's requisition of supplementary reports of a physician.

We accordingly affirm that part of the order of the district court directing the return of petitioner's license to her, but only on the ground that the commissioner's order, being based on a demand for deposit of security in an amount not reasonably supported by competent reports in his possession at the time of the order, was arbitrary. We reverse that part of the order which, in effect, prohibits the commissioner from requisitioning supplementary reports and redetermining the amount of security to be deposited and, upon petitioner's failure to make such deposit, suspending her license according to statute.[17]

Affirmed in part; reversed in part.

---

[17] We do not determine whether any such redetermination or order of suspension may be foreclosed at this time by reason of any provision of the statute that may have been inapplicable at the time of these proceedings. If such further order is made, of course, petitioner will have a right of review under the provisions of Minn. St. 170.22.